## Case No. 7,502.

### JONES v. VANZANDT.

[2 McLean, 611; [1] 1 West. Law J. 56.]

Circuit Court, D. Ohio. July Term, 1843.

Fox, Southgate & Morris, for plaintiff.

Mr. Chase, T. Morris and Mr. Jolliffe, for defendant.

OPINION OF THE COURT. This is a motion for a new trial, and, also, in arrest of judgment. The jury found for the plaintiff twelve hundred dollars, in damages, on the third and fourth counts of the declaration. [Case No. 7,501.]

The first ground on which a new trial is asked, is, "that a peremptory challenge was allowed the plaintiff, after he expressed himself satisfied with the jury, and after two peremptory challenges had been made by the defendant." The statute gives a right to each party to challenge, peremptorily, two jurors. There was some difference of opinion among the members of the bar as to the state practice on the subject; and the court thought it not unreasonable to suffer a juror to be challenged by the plaintiff, under the above circumstances. One of his counsel had, inconsiderately, remarked, that they were satisfied with the jury. Both parties were allowed, in this respect, the right given them by the statute, and there was nothing in the mode of exercising that right, which could, in any degree, prejudice the cause of either.

The second ground assumes that "the court erred in charging the jury that it was not necessary to prove that the defendant, intentionally, placed the colored persons, in question, out of view for the purpose of eluding the search of the master or his agent, in order to establish the fact of concealment, or to prove that he received, sheltered, and placed them out of view for said purpose,

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

in order to establish the fact of harboring, but charged that it was sufficient, if the jury believed from the evidence, that the defendant received the colored persons into his wagon, and transported them to Bates' from Walnut Hills, with intent to facilitate their escape from their master."

The court gave no such charge as the above, either in terms or in substance. In the published charge, which is substantially correct, the court say: "Any overt act which shall be so marked in its character, as not only to show an intention to elude the vigilance of the master, but is calculated to attain such an object, is a harboring of the fugitive in violation of the statute. It is clearly within the mischief the statute was designed to prevent." And, again: "To constitute the offence under the statute, it is not necessary to incarcerate the fugitive in a dungeon or room; if he be taken in a wagon and conveyed from the shore of the Ohio to the shore of Lake Erie, which enables him to escape into Canada, I suppose no one could doubt that the individual had made himself responsible. And if conveying the fugitive the whole of this route would incur the penalty, on the same principle the conveyance of him such a part of the route as shall cause the loss of his services to the master would equally incur liability." The counsel who make the motion assume that the court said, that the transportation of the fugitives by the defendant, in his wagon, from the Walnut Hills to Bates', if done with the intent to facilitate their escape from their master, was sufficient to charge the defendant under the statute.

It will be seen from the printed charge, which, in this respect, is literally correct, that the transportation spoken of, must be such as to cause the loss of the services of the fugitives to the master, or such as is calculated and designed to produce such a result. And this construction of the statute is said to be not as strict, as the nature of the act requires, but a liberal one, such as is given to a remedial statute. What shall be a harboring or concealing within the statute is necessarily a matter of construction. So diversified is the conduct of men and their devices to evade the law, that no statute could define, with precision, what particular acts shall constitute a harboring or concealing within its spirit. The object of the statute is, to prevent such acts as shall place the fugitive beyond the reach of his master. The word harbor means "to entertain," "to shelter," "to secure," "to secrete," "to receive entertainment," "to take shelter." In the sense of the statute it means a fraudulent receiving, securing, hiding, or placing, by transportation or otherwise, a fugitive from labor beyond the reach or knowledge of his master. The act must be fraudulent. That is, it must be done with a fixed intention to violate the law by defeating its object, which is a fraud upon the law as well as upon the rights which the law designed to protect. In the language of the charge, "the act must be so marked in its character, as not only to show an intention to elude the vigilance of the master, but such as is calculated to attain that object. Now, from this definition it would seem that no man, who respects the laws of his country, can be in danger of incurring the penalty of this act. It cuts off from no individual the exercise of humanity. He may indulge, and safely indulge, the better feelings of his nature, in sympathizing with the distressed, and in administering to their comfort. For his acts only is he amenable under the law. His advice to the fugitive does not subject him to any penalty. He may clothe him and give him food. There is only one thing which the law prohibits him from doing, and that is, he shall not harbor or conceal the fugitive so as to defeat the claims of his master. He shall not deliberately and intentionally violate the law of his country. Any thing short of this he may do.

If an individual, under cover of the night, shall possess himself of a dozen or more colored persons, and concealing them in a closely covered carriage, shall, by a rapid movement, drive them from or near the place where such persons were held to service, by the laws of the state, to a place beyond the reach of the master, could any one doubt that such an act would be a violation of the law. The court and jury must determine what shall amount to a harboring or concealing within the meaning of the statute, the same as what shall constitute treason, murder, burglary, robbery, and every other crime known to the law. The facts are as various as the cases, and in each case the facts must fix the character of the offence. I was not prepared to hear, in a court of justice, the broad ground assumed, as was assumed in this case before the jury, that a man, in the exercise of what he conceives to be a conscientious duty, may violate the laws of the land. That no human laws can justly restrain the acts of men, who are impelled by a sense of duty to God and their fellow creature. We are not here to deal with abstractions. We can not theorize upon the principles of our government, or of slavery. The law is our only guide. If convictions, honest convictions they may be, of what is right or wrong, are to be substituted as a rule of action in disregard of the law, we shall soon be without law and without protection. The pretext for violating the rights of those who may become obnoxious to censure, can easily be assumed and maintained. And the same plea of the rights of conscience, and the high motive of duty, will be asserted, however absurd, everywhere, in justification of wrongs. What one man, or association of men, may assume as the basis of action, may be assumed by all others. And in this way society may be resolved into its original elements. and then the governing principle must be force. Every approximation to this

state is at war with the social compact. If the law be wrong in principle, or oppressive in its exactions, it should be changed in a constitutional mode. If the organization of our government be essentially wrong, in any of its great principles, change it. Change it in the mode provided. But the law, until changed or abrogated, should be respected and obeyed. Any departure from this inflicts a deep wound on society, and is extremely demoralizing in its effects. No good man, in the exercise of his sober judgment, can either feel or act in violation of this rule.

The third reason for a new trial is, "that the court erred in charging the jury that it was not necessary, in order to establish the plaintiff's right to recover, to prove actual notice to defendant from the complainant, or some one acting in his behalf, that the persons alleged to be harbored or concealed, by him, were fugitives from labor within the meaning of the act of congress [1 Stat. 302], but charged that it was sufficient, if the jury should be satisfied, from the evidence, that the defendant knew that such persons were fugitives from labor, from the admission of the negroes, or otherwise." The words of the law—if any person "shall harbor or conceal (a fugitive from labor), after notice that he or she was a fugitive, shall forfeit, &c." That this notice need not be given in writing is admitted; but it is insisted that it must come to the person who harbors the fugitive from the master, his agent, or attorney. I lay it down as a general principle, that where the law speaks of notice it is never necessary that such notice should be in writing, unless so required by the statute, commercial usage, or by practice of the courts. A notice of taking a deposition the statute requires to be in writing; and a written notice to the indorser of a bill of exchange or promissory note must be in writing by commercial usage; and in many cases written notices are required under rules of courts. But the law of notice is best illustrated, and is most appropriate to the case in hand, which applies to a purchaser of real estate, for a valuable consideration, with notice. Now, if he had notice of a prior title, at the time he purchased, the law holds him to be a fraudulent purchaser. As in the case under consideration, if the defendant harbored the fugitives from labor, claimed by the plaintiff, after notice that they were such fugitives, he committed a fraud on the law.

It is laid down in The Ploughboy [Case No. 11,230], as a general rule, "that whatever is sufficient to put the party upon inquiry is good notice." And, also, "where a party has knowledge of the facts he has notice of the legal consequence resulting from those facts." An individual who passes a counterfeit coin does not violate the law unless he knew it to be counterfeit. And this guilty knowledge is shown by proving that the same person passed similar coins at other times, or that such coins were found in his possession. Now, if the persons in question were fugitives from labor, and the defendant had full knowledge of the fact, is it important how this knowledge was acquired? Notice is information. Knowledge is equivalent to notice in cases where it is not required to be in writing. Vanzandt, the defendant, on the trial of certain persons for kidnapping at Lebanon, swore that he received these negroes near the Lane Seminary, at three o'clock on Sabbath morning, he having returned to that place, from the Cincinnati market, on Saturday evening. That they were brought to that place in two carriages, and were delivered to him by Mr. Alley. The cover of the defendant's wagon was closed at both ends of it so as to attract attention. This was done, he stated to some of the witnesses, "to keep out the cold," whilst to others he said, "he started at three o'clock in the morning, that he might have the cool of the morning." This was on the 24th April of last year. To Thurman the defendant said, "he knew the colored persons in his wagon were not free, but he said they ought to be free." Bates asked the defendant if he had a load of slaves or Kentuckians; he replied, "They are as free by nature as you are." McDonald heard the defendant say that he was not ashamed of what he had done. That he would help his fellow mortals out of bondage. He said the colored persons were free by the constitution. To Hargrave he observed: "If you had not interfered the negroes would then have been free, but now they are slaves, or in bondage." Now, taking into view the manner in which the slaves were received; the time of night; the rapid manner in which they were driven, six or seven miles beyond the residence of the defendant; and the attempt to escape from his pursuers by running his horses; the manner in which his wagon was covered, and his own confessions that the fugitives were slaves, no one of sane mind can doubt that he had full notice that the colored persons were fugitives from labor. And that he intended to place them beyond the reach of pursuit seems to be equally clear. Now, whether the law of congress be politic or not, is not a question for the court. They are bound to execute it. To require a notice, verbal or written, to the person who harbors slaves before he is responsible, under the law, from the owner or his agent, would, in effect, strike the law from the statute book. It would be unreasonable and impracticable. It would be against all the analogies of the law.

No one can look at the facts of this case with an honest endeavor to carry out and give effect to the law, who can, it would seem to me, doubt on this subject. No individual is responsible under the law, unless he has a full knowledge that the persons harbored are fugitives from labor, and he so disposes of them, as to place them beyond the reach of their pursuers, or, as may be calculated to elude pursuit. The act must be an intention-

al fraud upon the law, by an utter disregard of its provisions. No law-abiding citizen need fear a liability under this statute.

The third ground of the motion is, "that the court erred in charging the jury that the plaintiff was entitled to recover from the defendant, by way of damages, the sum of four hundred and fifty dollars, paid as a reward given by a statute of Kentucky to the individuals who forcibly stopped the defendant on the highway in Ohio, seized the colored persons in question and carried them out of the state of Ohio into the state of Kentucky, without legal process and without any authority or request from the claimant or his agent or attorney." On this question the court had nothing to do with the illegal conduct of Hefferman and Hargrave, who took the slaves from the defendant. They were not upon their trial, and we could not inquire whether their acts were legal or otherwise. The only inquiry was, whether, by the acts of the defendant, the plaintiff had been compelled to pay the above sum. The matter of fact was left to the jury, and no doubt can be entertained by the court that if the payment of the money resulted from the acts of the defendant, the jury very properly included it in their verdict. This question did not arise under the law of Ohio, but under the law of Kentucky. The plaintiff was subject to the law of Kentucky, and that law imposed the duty on him to pay, as a reward, the above sum to those who should return his slaves, who had escaped from his service.

The plaintiff was only entitled to recover in this case for the injury which had been done him by the defendant. And this injury, so far as this item is concerned, is measured by the law of Kentucky. Now, could any thing be more preposterous than to hold that the plaintiff, if entitled to recover, should not recover the above damage, because, by the laws of Ohio, Hefferman and Hargrave could not have recovered the reward which was unquestionably given to them by the law of Kentucky. In regard to this reward the plaintiff was subject to the law of Kentucky, and not to the law of Ohio. The reward was paid, necessarily and legally paid, under the Kentucky statute. Whether the payment of this reward resulted from the acts of the defendant was a question exclusively for the jury.

The court, it is alledged, also, "erred in charging the jury that the plaintiff was entitled to recover the market value of Andrew, if they should believe upon the evidence that he escaped in consequence of the harboring and concealing by the defendant." The court charged the jury that if they believed, from the evidence, that the services of the boy, Andrew, were lost to the plaintiff through the acts of the defendant, that they should give the value of his services. And they called the attention of the jury to one or more witnesses who said the services of the boy were worth six hundred dollars, and that he could have been sold for that sum. It is presumed that a slave is always purchased in reference to his services. His services are bought and sold when the slave is bought and sold. They both, under the laws of Kentucky, mean the same thing. It was, however, to the value of the services of the boy that the attention of the jury was particularly directed. As to the sixth ground no remarks are necessary.

The seventh reason is, that the verdict is against evidence. And first, it is contended "that there was no evidence that the escape of Andrew was occasioned by the act of the defendant." This point was fully and fairly left to the jury. It was not a matter for the court. Andrew was received among the other slaves, by the defendant, according to his own confession, from Alley, at Walnut Hills, at three o'clock, on Sabbath morning; he was transported with the other negroes until the wagon was arrested, when Andrew escaped. He, it seems, drove the wagon at least a part of the route. Vanzandt swore in the trials at Lebanon, that "he did not know where the negroes were from or where they were desirous of going." But from the circumstance of his receiving them at three o'clock in the morning, from another individual who conveyed them to the Walnut Hills in two carriages, at that unusual hour, the jury may have presumed that the defendant and Alley acted in concert. That there was strong ground for this presumption no one will deny. And if this concert existed, it would make the defendant responsible for the loss of the services of this boy. In any point in which the question may be considered, the court cannot say that the verdict, in this respect, was against evidence; or that it was not founded on facts and circumstances which the jury had a right to weigh and determine. And this answer will equally apply to the alledged want of evidence to show that the expenses of the recapture resulted from the defendant's conduct.

The eighth ground is, "that the damages are excessive." And first, it is contended "that the liability to pay the rewards of recapture was incurred in consequence of the escape, and did not spring from any act of the defendant." This, in another form, has already been sufficiently considered. In the second place it is urged "that only the value of the services of the colored people, between their recaption by the defendant and their restoration to their master, should have been taken into consideration by the jury." The jury had, undoubtedly, a right to take into consideration the value of the services of the boy, Andrew, if, from the evidence, they believed these services had been lost to the plaintiff by the acts of the defendant. And there is no doubt that they did estimate in their verdict the value of those services. But a difficulty arises, in regard to the damages, from the counts on which the verdict was rendered.

The verdict was given on the third and fourth counts of the declaration. These counts go for the loss of the services of the slaves six days, and in the third count is superadded "and the plaintiff was thereby put to great trouble and cost in recovering the slaves." On the seven other counts there was no finding by the jury. The first, sixth, seventh, and eighth counts were abandoned on the trial; and the court instructed the jury there was no evidence under the fifth count. That count charged the defendant with obstructing the arrest. And the plaintiff now asks that all the counts except the third and fourth, on which the jury have found, be entered upon the record as having been abandoned. The second, fifth and ninth counts, were not abandoned.

Where a mistake is made in recording the verdict, the court may amend by the judge's notes (2 Strange, 1197; 3 Term R. 749); or by the notes of the clerk (1 Salk. 47, 51). So, where part of the plaintiff's claim is good and part bad, and the jury find entire damages, if it appear from the judge's notes, that damages were given only for the part which was good, the court will allow the postea to be amended. 2 Johns. Cas. 17. So, where one count in a declaration is good and the others bad, if the judge certify that the evidence applied solely to that count, &c., the verdict may be amended by applying it to the good count. 1 Caines, 381; 11 Johns. 98. In Rockfeller v. Donnelly, 8 Cow. 652, the court of errors held, that the verdict on one out of several issues, if the finding comprise the whole merits, is not error. That a mistake in not entering a verdict on all the issues may be amended, or passed over on error as actually amended. 12 Wend. 215. After a general verdict upon the counts, one good and the other bad, and after a reversal of the judgment for such cause the postea will be suffered to be amended so as to have the verdict entered upon the good count only where it appears the evidence applied to both counts. The rule established in New York is somewhat different from the English rule. In 1 Ld. Raym. 324, it is laid down that a verdict must comprehend the whole issue or issues submitted to the jury in that particular cause, otherwise the judgment founded upon it may be reversed. In Sanford v. Porter [Spencer v. Goter], 1 H. Bl. 78, it is said the court have no authority to amend or alter the verdict actually found by the jury in point of substance. But a mistake in entering the verdict will be corrected.

In [Patterson v. U. S.] 2 Wheat. [15 U. S.] 221, it is said, a verdict is bad if it varies from the issue in a substantial matter, or if it find only a part of that which is in issue; this rule results from the nature and the end of pleading, although the court may give form to a general finding so as to make it harmonize with the issue, yet if the finding is different from the issue or is confined to a part only of the matter in issue, no judgment can be rendered on the verdict. In Bac. Abr. tit. "Verdict," letter L, it is said, if part of the issue be insensible, the verdict, notwithstanding it is a general one, is good; but if part of the issue which is sensible be insufficient in law and the verdict be a general one, it is bad. Id. letter M. If a verdict only find part of the issue and be silent as to the residue, it is bad even for that part which, if it had stood alone, would have been well found; because the jury have failed in ther duty, which was to find the whole that is in issue. In Clark v. Irvin, 9 Ohio, 132, the court say the verdict in the case below was a general one of not guilty. The jury did not pass upon the issues joined by two of the defendants. This has heretofore been held a sufficient ground for reversing the judgment. 5 Ohio, 227. By the 131st section of the practice act (Swan's St. 684), it is provided, "that where there are, in a declaration, several counts, any one or more of which shall be defective and the residue good and entire damages are given, the verdict shall be good and effectual in law, provided the plaintiff, before the jury retire from the bar, apply to the court to instruct the jury to disregard such defective count or counts." And by the 142d section of the same act, where some counts are defective, and a general verdict, the court may render judgment on the good counts. These statutes are not in force in this court, as they have never been adopted by congress or the court.

The case in 8 Cow., above cited, is the only one in point, and that considers the finding of the jury for the plaintiff on a part of the counts, is a virtual finding for the defendant on the other counts. But the correctness of this rule is doubted when the counts, like the declaration under consideration, contain distinct grounds of action. In the fifth count the defendant is charged with hindering an arrest of the fugitives, by the agents of the plaintiff. In the ninth count the defendant is charged with having harbored the boy, Andrew, &c., by which his services were entirely lost to the plaintiff. Now can the court amend the verdict by entering not guilty on these two counts. It is not a formal amendment, though the objection may seem to be technical. That the jury found the full value for the services of Andrew is clear, and yet such finding, it would seem, can only be sustained under the ninth count. Damages under the third and fourth counts can only be assessed, for the expenses incurred by the plaintiff in the recaption of his slaves, and for the loss of their services, which is stated to have been six days in both the counts. If the court then shall enter an abandonment of the ninth count, I cannot see how this verdict can be sustained. Though it does not aid the plaintiff as the jury have not passed upon it. It is said that in an action of tort the court will seldom, if ever, grant a new trial, on account of excessive damages. But the data on which the damages were estimated in this

case were distinct items of expense or loss, estimated by the witnesses in dollars. The jury were instructed, if they found for the plaintiff, that there was nothing in the case which called for exemplary damages. So it would seem whether the counts not embraced by the verdict be abandoned or not, that there are great ⌐ifficulties in sustaining the verdict. The damages found are double the sum which in any view the jury could take, under the third and fourth counts, should have been given. Under the ninth count, so far as the verdict is concerned, it might have been sustained.

I will take a very concise view of the reasons in arrest of the judgment. It is contended that no action is given to the master, by the act of congress, except that to recover the penalty of five hundred dollars. The latter part of the 4th section of the act declares, that if any person "shall harbor or conceal a fugitive from labor, after notice that he or she was a fugitive from labor, such person shall, for such offense, forfeit and pay the sum of five hundred dollars; which penalty may be recovered by, and for the benefit of such claimant, by action of debt, in any court proper to try the same, saving, moreover, to the person claiming such labor or service, his right of action for, or on account of the said injuries." Now it must be admitted that on the principles of the common law, the plaintiff could not sustain this action. It is founded upon the statute, under the constitution. And as it is a statutory remedy, it must clearly exist and be strictly pursued. The saving of the right of action to the claimant, is in the nature of a proviso, and to understand it every part of the statute which is connected with it must be considered. The third section provides the mode of recovering a fugitive from labor. The fourth section declares what acts shall constitute offences, for either of which the claimant may recover, as a penalty, five hundred dollars. It is made an offence to obstruct or hinder the claimant, his agent or attorney, in arresting the fugitives, or to rescue him after the arrest. It also subjects an individual to the penalty, who shall harbor or conceal the fugitive, after notice that he is a fugitive from labor; saving, moreover, to the complainant a right of action for, or, on account of, the said injuries, or either of them. The injuries are defined, and the penalty provided; but this penalty, though given to the claimant, is given as a penalty, and not to indemnify him for the injuries received. For these, or any one of them, a right of action is saved. The form of the action was not saved or given, for that existed before, as a means of redress for a wrong done. But it was the ground of action which was saved, notwithstanding the penalty inflicted. The statute, under the constitution, defined the rights of the master, and provided a mode by which his fugitive slave might be reclaimed. Now, this was a right created by the constitution and the law. Under the in-

stitutions of Ohio, this right has no other foundation than the constitution and act of congress. But, under these, it is a right, substantive and important. And, for an obstruction in the exercise of this right, by hindering an arrest of the fugitive, by rescuing him, by harboring or concealing him, whereby an injury is done to the master, his right of action is saved. The acts prohibited are unlawful. because the law punishes them, and saves a right of action to the claimant, for the injury done—the same injury for which the penalty may be exacted. This is the plain meaning of the statute.

The objection that, as no action lay at common law for the injury, and none being expressly given by statute, the action can not be maintained, is wholly unsustainable. The statute creates the right, and declares what shall constitute the wrong; and, for the redress of every wrong, the common law gives a remedy. It was only necessary for the statute to declare, having provided a penalty, that it should not bar a remedy, by action, for the injury done.

It is alledged, as a reason in arrest of the judgment, "that the third and fourth counts of the declaration, on which the verdict is rendered, are both bad. The third, because it contains no sufficient averment of escape or notice; the fourth, because it contains no sufficient averment of notice, and does not conclude against the form of the statute." The averments of escape, in both counts, are substantially the same. In the third count, after stating the names of the slaves, and ownership of the plaintiff, and that, under the laws of Kentucky, they were his property, and owed him service, and were held to labor, it is stated that they unlawfully, wrongfully and unjustly, without the license or consent, and against the will of the plaintiff, departed and went away from, and out of, the service of the plaintiff, at Boone county, and the state of Kentucky, and came to Hamilton county, in the state and district aforesaid; yet the said defendant. after notice that the said persons were the slaves of the plaintiff, and fugitives from labor, but contriving, &c., then and there, to wit: at the county and the district aforesaid. The notice is here sufficiently alledged, and, also, that the colored persons owed service to the plaintiff, under the laws of Kentucky. It need not to have been averred that they were slaves, &c.; but this, being a stronger language than the act requires, does not vitiate the count. There is, however, an important defect in the allegation, of their escape. The word escape is used in the statute, and could, undoubtedly, be most appropriately used in the declaration; but other and equivalent words may answer; and such words, I think, are found in these counts. Without the license or consent, and against the will of the plaintiff, the slaves departed; and, it is averred, that the defendant had notice, before he harbored

them, that they were fugitives from labor. But to what place did they escape? The words of the act are—"When a person, held to labor in any of the United States, &c., under the laws thereof, shall escape into any other of the said states," &c. Now, the allegation in this count, is, that the slaves escaped from Boone county, and the state of Kentucky, and came to the defendant, at "Hamilton county, in the state and district aforesaid." What state and district aforesaid? The grammatical reference is to the state and district last above named. The state of Ohio is not named in the count; and the words, "Hamilton county," are not a sufficient designation. The direct reference then, is, to the state of Kentucky, which, by the law, is a district; and, in this view, there is no escape alledged within the statute.

In the second count, which has been abandoned, the slaves are alledged to have departed and went away from the plaintiff, and out of his service, at said Boone county, and came to the defendant, at "Hamilton county, in the state of Ohio, and the district aforesaid." The first count, which has also been abandoned, being founded on the common law for enticing away the slaves, the venue is laid under a videlicet "in the district of Ohio, as aforesaid." There is no district of Ohio alledged, to which this allegation could refer, unless it be in the title of the count, as a caption to the declaration. This action being founded on the statute, great strictness is required. A good ground of recovery must be shown, if not in the words of the statute, in every material circumstance. And if, in the language of the statute, the slaves did not escape from one state, where they were held to labor, into another state, the action can not be sustained. The title, as set out, would seem to be defective. And this is not cured by a verdict. I entertain great doubts whether the reference to the preceding counts, as regards the escape, can make good the third count. At least, there is great uncertainty in the reference. A reference to the margin may be sufficient for the venue, but the allegation under consideration is a part of the title. The fourth count, in this respect, is liable to the same exception as the third. But there is another exception taken to (the fourth count—"that it does not conclude against the form of the statute."

Mr. Chitty (1 Chit. Pl. 246) says: "If, however, an offence be created by a statute, and a penalty be inflicted, the mere statement of the facts constituting the offence will be insufficient, for there must be an express reference to the statute, as, by the words, 'contrary to the form of the statute,' in order that it may appear that the plaintiff grounds his case upon, and intends to bring it within, the statute." In 405 he further remarks: "It is material, in all cases, that the offense or act charged to have been committed, or omitted by the defendant, appear to have been within the provision of the statute; and all circumstances necessary to support the action must be alledged." This principle is fully sustained by Mr. Justice Story, in the case of Smith v. U. S. [Case No. 13,122]; and, also, in Sears v. U. S. [Id. 12,592]. He says: "The offence charged in the declaration, is not alleged to be contrary to the form of any statute. The necessity of such averment, in an action founded upon a penal statute, is abundantly supported by authority." 1 Saund. 135, note. These, it is true, were penal actions; or, actions brought to recover the penalty given in the statute. The same degree of strictness may not be essential, in an action for damages, under a statute. But if the action be founded exclusively upon the statute, and can not be maintained at common law, a reference to the statute, as showing the right of the plaintiff, it seems to me, is essential. The defendant is charged with harboring the slaves of the plaintiff, who had escaped from his service in Kentucky. But the wrong charged is no legal wrong, except as it is made so by statute; and the fourth count does not refer to the statute. The statute is a public one, but it is the foundation, and the only foundation, of the plaintiff's right. It may not be necessary to adopt the formal conclusion, as was held necessary in the above cases, where the action was brought for the penalty. But, it seems to me, that the declaration must refer to the statute, as an essential part of the plaintiff's right. I have not had time to look into the authorities extensively on this point; but I think from analogy, and the reason of things, the fourth count is defective in this particular.

The constitutionality of the act of congress is questioned, on the ground that the sixth article of the compact, in the ordinance of 1787, for the government of the Northwestern Territory, provides "that any person escaping into the territory, from labor or service, is lawfully claimed in any one of the original states, such fugitive may be lawfully reclaimed, and conveyed to the person claiming his or her labor or service, as aforesaid." This, it is insisted, is paramount to the act of congress, and imposes no obligation on this state to deliver up a fugitive from labor, except when claimed by a citizen of one of the original states. The six articles of this ordinance are declared to be "a compact between the original states, and the people and states in the said territory, and forever to remain unalterable, unless by common consent." The act of congress, respecting fugitives from labor, does not conflict with the above provision. It does not purport to repeal the article, nor to modify it. A new and substantive provision is adopted, which carries out the principle of the ordinance. And it extends the right of claimants to the new states. The ordinance does not prohibit this. It is, indeed, carrying out its spirit and inten-

tion. For it can hardly be supposed that congress, in adopting the ordinance, could have intended to secure rights, in regard to claiming fugitives from labor, to the citizens of the original states, which should not be extended to the citizens of all the states. I deem it unnecessary to consider this subject at large; and I will only say, as there is no repugnancy between the act of congress and the above article, I do not see how, if the ordinance retains its full force, the act can be unconstitutional, upon the ground assumed.

As a motion for a new trial was first in order, and as the third and fourth counts, on which the jury found their verdict, claim only compensation for the loss of the services of the slaves for six days, and an indemnity for the expenses to which the plaintiff had been subjected by the acts of the defendant, which do not, from the evidence, exceed six hundred dollars, and, as the verdict rendered was for twelve hundred dollars. I feel bound to set aside the verdict.

In the ninth count, the plaintiff claims for the entire loss of the services of Andrew; but as the jury did not find under this count, and it has been abandoned, it must be considered, for the purposes of this motion, as stricken from the record.

A new trial is granted at the costs of the defendant.