UNITED STATES v. MORRIS et al.

(District Court, E. D. Arkansas, E. D. October 9, 1903.)

1. CIVIL RIGHTS—POWER OF CONGRESS TO PROTECT—CONSTITUTIONALITY OF STATUTE.

Congress has the power, under the thirteenth constitutional amendment, to protect citizens of the United States in the enjoyment of those rights which are fundamental and belong to every citizen, if the deprivation of such rights is solely because of race or color; and section 1 of the civil rights act (Rev. St. U. S. § 1978 [U. S. Comp. St. 1901, p. 1262]) is within such power.

2. CONSPIRACY—PREVENTING EXERCISE OF CIVIL RIGHTS.

A conspiracy between two or more persons to prevent negro citizens from exercising the right to lease and cultivate land, because they are negroes, is a conspiracy to deprive them of a right secured to them by the Constitution and laws of the United States, within the meaning of Rev. St. U. S. § 5508 [U. S. Comp. St. 1901, p. 3712].

On Demurrer to Indictment.

W. G. Whipple, U. S. Atty.

O. N. Killough, Quarles & Moore, and L. C. Going, for defendants.

TRIEBER, District Judge. The defendants are indicted for a violation of the provisions of section 5508, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3712]; the specific charge being that they conspired to injure, oppress, and intimidate certain citizens of the United States, of African descent, in the free exercise or enjoyment of certain rights secured to them by the Constitution and laws of the United States, on account of their being negroes. The right which it is charged the defendants sought to prevent the persons named in the indictment from exercising, on account of their race and color, is the right to lease lands and cultivate them—a right alleged to be guarantied to them by the thirteenth amendment to the Constitution of the United States and the provisions of section 1 of the act of Congress entitled "An act to protect all persons in the United States in their civil rights and furnish means of their vindication," enacted April 9, 1866 (chapter 31, 14 Stat. 27, digested in the United States Revised Statutes as section 1978; U. S. Comp. St. 1901, p. 1262). The demurrer challenges the constitutionality of both statutes. The constitutionality of section 5508 is no longer open to controversy, its validity having been determined and upheld by the Supreme Court in Ex parte Yarbrough, 110 U. S. 651, 4 Sup. Ct. 152, 28 L. Ed. 274; United States v. Waddell, 112 U. S. 76, 5 Sup. Ct. 35, 28 L. Ed. 673; Baldwin v. Franks, 120 U. S. 678, 7 Sup. Ct. 656, 763, 32 L. Ed. 766; Logan v. United States, 144 U. S. 291, 12 Sup. Ct. 617, 36 L. Ed. 429; Motes v. United States, 178 U. S. 458, 20 Sup. Ct. 993, 44 L. Ed. 1150.

The only question, therefore, left for determination, is the constitutionality of section 1 of the civil rights act of April 9, 1866. Nothing in the Constitution of the United States as originally adopted, or in any of the first twelve amendments to that instrument, adopted shortly after the ratification of the Constitution, would warrant the enactment of this act by Congress. Section 2 of article 4, guaran-

tying to citizens of each state all privileges and immunities of citizens in the several states, merely secures and protects the right of a citizen of one state of the United States to pass into any other state of the Union for the purpose of engaging in lawful business, to acquire and hold property, to maintain actions in the courts of that state, and to be exempt from taxes and excises not imposed by the state on its citizens, free from all discriminations—such discriminations being made by the state in its capacity of a sovereign—but does not apply to acts of individuals. Paul v. Virginia, 8 Wall. 168, 19 L. Ed. 357; Ward v. Maryland, 12 Wall. 418, 20 L. Ed. 449; Slaughterhouse Cases, 16 Wall. 36, 21 L. Ed. 394; Blake v. McClung, 172 U. S. 239, 19 Sup. Ct. 165, 43 L. Ed. 432.

If the power to enact the legislation involved in this proceeding exists at all, it must have been granted by some provision of the last three amendments to the Constitution—the thirteenth, fourteenth, or fifteenth. As the acts contemplated by this statute are those of individuals, as well as of officers in the enforcement of the statutes of a state or in the discharge of official functions, neither the fourteenth nor fifteenth amendment can be relied upon as an authority for it, for it is now well settled that these two amendments have reference solely to actions of the state, and not to any action of private individuals, although it is immaterial whether the state acts by its legislative, executive, or judicial authority. United States v. Reese, 92 U. S. 214, 23 L. Ed. 563; United States v. Cruikshank, 92 U. S. 542, 23 L. Ed. 588; Virginia v. Rives, 100 U. S. 313, 25 L. Ed. 667; Ex parte Virginia, 100 U. S. 339, 25 L. Ed. 676; Civil Rights Cases, 109 U. S. 3, 3 Sup. Ct. 18, 27 L. Ed. 835; United States v. Harris, 106 U. S. 629, 1 Sup. Ct. 601, 27 L. Ed. 290; James v. Bowman, 190 U. S. 127, 23 Sup. Ct. 678, 47 L. Ed. 979.

The power of Congress to enact such legislation must, therefore, be found in the thirteenth amendment, else it does not exist. That Congress assumed that its power was derived from that amendment, and not from either of the later amendments, is conclusively shown by the fact that at the time this law was enacted, in 1866, neither the fourteenth nor fifteenth amendment had been ratified, or even submitted by Congress to the states. The fourteenth amendment was submitted for ratification by resolution of June 16, 1866, and declared a part of the Constitution on July 21, 1868, while the resolution to submit the fifteenth amendment to the states was only passed by Congress on February 27, 1869, and the amendment promulgated as a part of the Constitution on March 30, 1870. The language of the thirteenth amendment differs materially from that used in the two later ones. While the fourteenth amendment provides that "no state shall make or enforce any law which shall abridge," etc., and the fifteenth amendment declares that "the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account," etc., the thirteenth amendment declares, "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States or any place subject to their jurisdiction." There is no limitation in that amendment confining the pro-

hibition to the states, but it includes everybody within the jurisdiction of the national government. This distinction in the language of these amendments was fully recognized by the Supreme Court in the Civil Rights Cases, 109 U. S. 3, 3 Sup. Ct. 18, 27 L. Ed. 835. Mr. Justice Bradley, in delivering the opinion of the court, said:

"We must not forget that the province and scope of the thirteenth and fourteenth amendments are different. The former simply abolished slavery. The latter prohibited the states from abridging the privileges or immunities of citizens of the United States by depriving them of life, liberty, or property without due process of law, and from denying to any the equal protection of the laws. The amendments are different, and the powers of Congress under them are different. What Congress has power to do under one, it. may not have power to do under the other. Under the thirteenth amendment, it has only to do with slavery and its incidents. Under the fourteenth amendment, it has power to counteract and render nugatory all state laws and proceedings which have the effect of abridging any of the privileges or immunities of citizens of the United States, or to deprive them of life, liberty, or property without due process of law, or to deny to any of them the equal protection of the laws. Under the thirteenth amendment, the legislation, so far as necessary or proper to eradicate all forms and incidents of slavery and involuntary servitude, may be direct and primary, operating upon the acts of individuals, whether sanctioned by state legislation or not. Under the fourteenth, as we have already shown, it must necessarily be and can only be corrective in its character, addressed to counteract and afford relief against state regulations or proceedings." 109 U. S. 23, 3 Sup. Ct. 30, 27 L. Ed. 835.

Congress is, therefore, authorized by the provisions of the thirteenth amendment to legislate against acts of individuals, as well as of the states, in all matters necessary for the protection of the rights granted by that amendment.

Slavery and involuntary servitude being prohibited within any place subject to the jurisdiction of the United States, and Congress being authorized by the second section of the amendment "to enforce this article by appropriate legislation," does that vest it with the power to protect those emancipated from slavery by this constitutional amendment in the enjoyment of such rights as it is charged in the indictment the defendants conspired to deprive them of, or is that power still solely reserved to the states, notwithstanding the adoption of this amendment?

The powers of Congress are limited to such matters as are expressly or by implication granted to it by the national Constitution, that being an enabling instrument, while the Constitutions of the states are limitations upon the power of the Legislatures of the respective states. There can be no doubt that the same power may exist at the same time in the nation as well as the states. Gibbons v. Ogden, 9 Wheat. 1, 235, 6 L. Ed. 23; Passenger Cases, 7 How. 540, 553, 561, 12 L. Ed. 702; Missouri, K. & T. Ry. Co. v. Haber, 169 U. S. 613, 627, 18 Sup. Ct. 488, 42 L. Ed. 878. The same act or series of acts may constitute an offense equally against the United States and the state, subjecting the guilty party to punishment under the laws of each government. Fox v. Ohio, 5 How. 410, 433, 12 L. Ed. 213; Moore v. Illinois, 14 How. 13, 19, 14 L. Ed. 306; United States v. Cruikshank, 92 U. S. 542, 550, 23 L. Ed. 588; Ex parte Siebold, 100 U. S. 371, 390, 25 L. Ed. 717; Cross v. North Carolina, 132 U. S. 131, 139,

10 Sup. Ct. 47, 33 L. Ed. 287. The citizens of the United States resident within any state are subject to two governments—one state, and the other national. Every citizen owes allegiance to both of these governments, and, within their respective spheres, must be obedient to the laws of each. In return he is entitled to demand protection from each within its own jurisdiction. The thirteenth amendment is a great extension of the powers of the national government. In the language of Mr. Justice Swayne in United States v. Rhodes, 1 Abb. 28, 37, Fed. Cas. No. 16,151:

"It trenches directly upon the powers of the states and of the people of the states. It is the first and only instance of a change of this character in the organic law. It destroyed the most important relation between capital and labor in all the states where slavery existed. It affected deeply the fortunes of a large portion of their people. It struck out of existence millions of property. The measure was the consequence of a strife of opinions and a conflict of interests, real or imaginary, as old as the Constitution itself. These elements of discord grew in intensity. Their violence was increased by the throes and convulsions of a civil war. The impetuous vortex finally swallowed up the evil, and with it forever the power to restore it. Those who insisted upon the adoption of this amendment were animated by no spirit of vengeance. They sought security against the recurrence of a sectional conflict. They felt that much was due to the African race for the part it had borne during the war. They were also impelled by a sense of right and by a strong sense of justice to an unoffending and long-suffering people. These considerations must not be lost sight of when we come to examine the amendment in order to ascertain its proper construction."

The effect of this amendment on the negro, as stated by the same learned jurist in that case, is "that the emancipation of a native-born slave by removing the disability of slavery made him a citizen without any further act of Congress."

Chancellor Kent defines "citizens" as follows: " 'Citizens,' under our Constitution and laws, means free inhabitants born within the United States, or naturalized under the laws of Congress." 1 Kent, Comm. 292. The possession of political rights is not essential to citizenship. Minor v. Happersett, 88 U. S. 162, 22 L. Ed. 627; 6 Am. & Eng. Enc. of Law, 15.

Every citizen and freeman is endowed with certain rights and privileges, to enjoy which no written law or statute is required. These are fundamental or natural rights, recognized among all free people. In our Declaration of Independence, the Magna Charta of our republican institutions, it is declared:

"We hold these rights to be self-evident: That all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty and the pursuit of happiness. That to secure these rights governments are instituted among men, deriving their just powers from the consent of the governed; that whenever any form of government becomes destructive of these ends, it is the right of the people to alter or abolish it, and to institute a new government, laying its foundation on such principles, and organizing its powers in such form, as to them shall seem most likely to effect their safety and happiness."

Nor were the framers of the Constitution of this state less emphatic in the expression of their views on this subject, for in the bill of rights of the state of Arkansas it is provided:

"All men are created equally free and independent, and have certain inherent and inalienable rights, amongst which are those of enjoying and

defending life and liberty; of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness. To secure these rights governments are instituted among men, deriving their just powers from the consent of the governed."

Can there be any doubt that the right to purchase, lease, and cultivate lands, or to perform honest labor for wages with which to support himself and family, is among these rights thus declared to be "inherent and inalienable"? In Corfield v. Coryell, 4 Wash. (C. C.) 371, Fed. Cas. No. 3,230, decided as early as 1823, Mr. Justice Washington said: "What these fundamental rights are would perhaps be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads." And thereupon he enumerated, among others, "To take, hold, and dispose of property, either real or personal." While this opinion was delivered by the learned justice in a cause heard by him on the circuit, it has received the approval of the Supreme Court of the United States in numerous cases. Slaughterhouse Cases, 16 Wall. 75, 97, 21 L. Ed. 394; Butchers' Union Co. v. Crescent City Co., 111 U. S. 746, 762, 764, 4 Sup. Ct. 652, 28 L. Ed. 585; Blake v. McClung, 172 U. S. 239, 248, 19 Sup. Ct. 165, 43 L. Ed. 432.

In Butchers' Union Co. v. Crescent City Co., 111 U. S. 762, 4 Sup. Ct. 657, 28 L. Ed. 585, Mr. Justice Bradley, in a concurring opinion, says:

"The right to follow any of the common occupations of life is an inalienable right. It was formulated as such under the phrase 'pursuit of happiness' in the Declaration of Independence, which commenced with the fundamental proposition that 'all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty and the pursuit of happiness.' This right is a large ingredient in the civil liberty of the citizen."

Again, on page 764, 111 U. S., page 658, 4 Sup. Ct., 28 L. Ed. 585, he proceeds:

"I hold that the liberty of pursuit—the right to follow any of the ordinary callings of life—is one of the privileges of a citizen of the United States."

And again, on page 765, 111 U. S., page 658, 4 Sup. Ct., 28 L. Ed. 585:

"But if it does not abridge the privileges and immunities of a citizen of the United States to prohibit him from pursuing his chosen calling, and giving to others the exclusive right of pursuing it, it certainly does deprive him, to a certain extent, of his liberty; for it takes from him the freedom of adopting and following the pursuit which he prefers, which, as already intimated, is a material part of the liberty of the citizen."

These extracts were cited with approval and reaffirmed by the Supreme Court in Allgeyer v. Louisiana, 165 U. S. 578, 589, 17 Sup. Ct. 427, 41 L. Ed. 832. See, also, the able opinion of Judge Jones in The Peonage Cases (D. C.) 123 Fed. 671.

As is well known, in many of the states in which slavery had existed prior to the adoption of the thirteenth amendment, legislation was enacted in relation to the negroes which practically established a system of peonage but little removed from that of slavery; and owing to the passions and prejudices aroused by the Civil War, and which at that time had not yet been allayed, irresponsible per-

sons would prevent negroes from working or cultivating lands, and the courts of the states were powerless to protect them. It will serve no useful purpose to recite in this opinion the state of affairs then existing, but a review of them may be found in the opinion of Mr. Justice Swayne in United States v. Rhodes, supra, and in the Slaughterhouse Cases, 16 Wall. 36, 70, 80, 21 L. Ed. 394. To prevent these unjust discriminations against the negroes, Congress enacted this civil rights act, intending thereby to protect them in the enjoyment of those rights which are generally conceded to be fundamental and inherent in every freeman. The constitutionality of this act, although it has never been directly passed upon by the Supreme Court of the United States, has been upheld by Mr. Justice Swayne in United States v. Rhodes, supra, and by Chief Justice Chase in United States v. Turner, 1 Abb. 84, Fed. Cas. No. 14,247, in both of which cases its constitutionality was directly involved. Mr. Justice Swayne delivered a very elaborate opinion, reviewing most thoroughly the history of the amendment and the authorities bearing upon the issues involved, epitomizing his conclusions as follows:

"It would be a remarkable anomaly if the national government, without this amendment, could confer citizenship on aliens of every race or color, and citizenship, with civil and political rights, on the inhabitants of Louisiana and Florida, without reference to race or color, and cannot, with the help of the amendment, confer on those of the African race, who have been born and always lived within the United States, all that this law seeks to give them. It was passed by the Congress succeeding the one which proposed the amendment. Many of the members of both houses were the same. This fact is not without weight and significance. McCulloch v. Maryland, 4 Wheat. 401 [4 L. Ed. 579]. The amendment reversed and annulled the original policy of the Constitution, which left it to each state to decide exclusively for itself whether slavery should or should not exist as a local institution, and what disabilities should attach to those of the servile race within its limits. The whites needed no relief or protection, and they are practically unaffected by the amendment. The emancipation which it wrought was an act of great national grace, and was doubtless intended to reach further in its effects as to every one within its scope than the consequences of a manumission by a private individual. We entertain no doubt of the constitutionality of the act in all its provisions. It gives only certain civil rights. Whether it was competent for Congress to confer political rights, also, involves a different inquiry. We have not found it necessary to consider the subject."

In United States v. Cruikshank, 1 Woods, 308, 319, Fed. Cas. No. 14,897, the question before the court was the constitutionality of the enforcement act (Act May 31, 1870, c. 114, 16 Stat. 140), which Mr. Justice Bradley declared to be unconstitutional, as an unauthorized assumption of power by Congress under the fourteenth amendment, but in referring to the civil rights act, in this cause involved, expressed the following opinion:

"It was supposed that the eradication of slavery and involuntary servitude of every form and description required that the slave should be made a citizen and placed on an entire equality before the law with the white citizen, and therefore that congress had the power, under the amendment, to declare and effectuate these objects. The form of doing this, by extending the right of citizenship and equality before the law to persons of every race and color (except Indians not taxed, and, of course, excepting the white race, whose privileges were adopted as the standard), although it embraced many persons, free colored people and others, who were already citizens in several

of the states, was necessary for the purpose of settling a point which had been raised by eminent authority, that none but the white race were entitled to the rights of citizenship in this country. As disability to be a citizen and enjoy equal rights was deemed one form or badge of servitude, it was supposed that Congress had the power, under the amendment, to settle this point of doubt, and place the other races on the same plane of privilege as that occupied by the white race. Conceding this to be true (which I think it is), Congress then had the right to go further, and to enforce its declaration by passing laws for the prosecution and punishment of those who should deprive, or attempt to deprive, any person of the rights thus conferred upon them. Without having this power, Congress could not enforce the amendment. It cannot be doubted, therefore, that Congress had the power to make it a penal offense to conspire to deprive a person of, or to hinder him in, the exercise and enjoyment of the rights and privileges conferred by the thirteenth amendment and the laws thus passed in pursuance thereof. But this power does not authorize Congress to pass laws for the punishment of ordinary crimes and offenses against persons of the colored race or any other race. That belongs to the state government alone. All ordinary murders, robberies, assaults, thefts, and offenses whatsoever are cognizable only in the state courts, unless, indeed, the state should deny to the class of persons referred to the equal protection of the laws. Then, of course, Congress could provide remedies for their security and protection. But in ordinary cases, where the laws of the state are not obnoxious to the provisions of the amendment, the duty of Congress in the creation and punishment of offenses is limited to those offenses which aim at the deprivation of the colored citizen's enjoyment and exercise of his rights of citizenship and of equal protection of the laws because of his race, color, or previous condition of servitude.

" *To illustrate: If, in a community or neighborhood composed principally of whites, a citizen of African descent, or of the Indian race, not within the exception of the amendment, should propose to lease and cultivate a farm, and a combination should be formed to expel him and prevent him from the accomplishment of his purpose on account of his race or color, it cannot be doubted that this would be a case within the power of Congress to remedy and redress. It would be a case of interference with that person's exercise of his equal rights as a citizen because of his race. But if that person should be injured in his person or property by any wrongdoer for the mere felonious or wrongful purpose of malice, revenge, hatred or gain, without any design to interfere with his rights of citizenship or equality before the laws, as being a person of a different race and color from the white race, it would be an ordinary crime, punishable by the state laws only.*

"To constitute an offense, therefore, of which Congress and the courts of the United States have a right to take cognizance under this amendment, there must be a design to injure a person, or deprive him of his equal right of enjoying the protection of the laws, by reason of his race, color, or previous condition of servitude. Otherwise it is a case exclusively within the jurisdiction of the state and its courts."

These views, as well as those expressed by Mr. Justice Swayne in United States v. Rhodes, supra, were approved by the Supreme Court in United States v. Harris, 106 U. S. 629, 640, 1 Sup. Ct. 601, 27 L. Ed. 290.

The allegations in this indictment expressly charge that these acts of the defendants were on account of the parties against whom they were directed being negroes. Prior to the adoption of the thirteenth amendment, it had been determined by the highest court of the land that even a free negro, whose ancestors were imported into this country and sold as slaves, is not a citizen of the United States, and therefore could not sue in the courts of the United States; and, even if made a citizen by the laws of the state of his residence, the rights

thus conferred upon him were limited to that state, and did not entitle him to the privileges and immunities of a citizen in any other state. Scott v. Sandford, 19 How. 393, 405, 15 L. Ed. 691. Chief Justice Taney, in delivering the opinion of the majority of the court, said:

"Each state may still confer them [the rights of citizenship] upon an alien, or any one it thinks proper, or upon any class or description of persons, yet he would not be a citizen in the sense in which the word is used in the Constitution of the United States, or entitled to sue as such in one of its courts, nor to the privileges and immunities of a citizen in the other states."

On page 404 of that opinion (19 How., 15 L. Ed. 691) it is said:

"We think they [negroes] are not [citizens], and that they are not included and were not intended to be included under the word 'citizen' in the Constitution, and can therefore claim none of the rights and privileges which that instrument provides for and secures to citizens of the United States. On the contrary, they were at the time considered as a subordinate and inferior class of beings, who had been subjugated by the dominant race, and, whether emancipated or not, yet remained subject to their authority, and had no rights or privileges but such as those who held the power and the government might choose to grant them."

Under this decision, therefore, a negro, until after the enactment of the thirteenth amendment and the civil rights act of 1866, was, in the language of the court, "so far inferior that he had no rights which the white man was bound to respect." 19 How. 407, 15 L. Ed. 691. Although this opinion was severely criticised at the time, it was never overruled, and was at the time of the enactment of this civil rights act regarded as the law. Based upon this decision, several of the slave-holding states, shortly after its rendition, enacted laws absolutely prohibiting free persons of color from coming into, or, if living there, remaining within, their respective boundaries, upon penalty of being sold as slaves; and, being "descendants of ancestors who were imported into this country and sold as slaves," they could not, in view of the principle established by the Dred Scott decision, invoke the protection of article 4, § 2, of the national Constitution, although by the laws of the state of their residence they might have been endowed with all the privileges possessed by its white citizens. Obviously to remove all doubt as to the status of these people after the adoption of the thirteenth amendment, and to secure to them the rights belonging of right to freemen, Congress enacted this law, declaring all persons born in the United States and not subject to any foreign power to be citizens of the United States, without regard to race or color, and at the same session passed a resolution submitting to the states for ratification the fourteenth amendment, which provides that all persons born or naturalized in the United States shall be citizens thereof. It is therefore beyond controversy that the negro's freedom and citizenship are rights secured to him by the Constitution and laws of the United States, and which, according to the decision in the Dred Scott Case, he did not possess in the absence of such legislation.

The fugitive slave acts (Act Feb. 12, 1793, c. 7, 1 Stat. 302; Act Sept. 18, 1850, c. 60, 9 Stat. 462) were enacted in the exercise of the power of Congress similar to that sought to be effected by this act. By the provisions of that act it was a penal offense to knowingly and willingly obstruct or hinder the owner of the fugitive slave from

seizing or arresting him, or to harbor or conceal such person after notice that he was a fugitive slave. The constitutionality of this act was upheld in Jones v. Van Zandt, 2 McLean, 611, Fed. Cas. No. 7,502, Prigg v. Pennsylvania, 16 Pet. 539, 10 L. Ed. 1060, and Ableman v. Booth, 21 How. 506, 16 L. Ed. 169, as being authorized by article 4, § 2, of the Constitution, which was not as broad as the provisions of the thirteenth amendment. That provision merely provides that:

"No person held to service or labor in one state under the laws thereof, escaping into another, shall in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up, on claim of the party to whom such service or labor may be due."

The leading case in which this act was sustained by the Supreme Court is Prigg v. Pennsylvania, supra. It was there argued that the act of Congress was unconstitutional, "because it did not fall within the scope of any of the enumerated powers of legislation confided to that body." Mr. Justice Story, who delivered the opinion of the court, in disposing of that contention, said:

"Stripped of its artificial and technical structure, the argument comes to this: That although rights are exclusively secured by, or duties are exclusively imposed upon, the national government, yet, unless the power to enforce these rights or to execute these duties can be found among the express powers of legislation enumerated in the Constitution, they remain without any means of giving them effect by any act of Congress, and they must operate solely proprio vigore, however defective may be their operation; nay, even although, in a practical sense, they may become a nullity from the want of a proper remedy to enforce them or to provide against their violation. If this be the true interpretation of the Constitution, it must, in a great measure, fail to attain many of its avowed and positive objects, as a security of rights and a recognition of duties. Such a limited construction of the Constitution has never yet been adopted as correct, either in theory or practice. No one has ever supposed that Congress could, constitutionally, by its legislation, exercise powers or enact laws beyond the powers delegated to it by the Constitution. But it has on various occasions exercised powers which were necessary and proper as means to carry into effect rights expressly given and duties expressly enjoined thereby. The end being required, it has been deemed a just and necessary implication that the means to accomplish it are given also; or, in other words, that the power flows as a necessary means to accomplish the end."

All the judges of the Supreme Court concurred in that view; the only point on which there was a dissent being whether, under the constitutional provision, the powers of Congress were exclusive of the states. Shall the courts be less liberal in construing constitutional provisions in favor of freedom than those in favor of slavery?

In my opinion, Congress has the power, under the provisions of the thirteenth amendment, to protect citizens of the United States in the enjoyment of those rights which are fundamental and belong to every citizen, if the deprivation of these privileges is solely on account of his race or color, as a denial of such privileges is an element of servitude within the meaning of that amendment. In the language of Mr. Justice Field, in his dissenting opinion in the Slaughter House Cases:

"The abolition of slavery and involuntary servitude was intended to make every one born in this country a free man, and as such to give him the right

to pursue the ordinary avocations of life without other restraint than such as affects all others, and to enjoy equally with them the fruits of his labor. A prohibition to him to pursue certain callings, open to others of the same age, condition, and sex, and to reside in places, where others are permitted to live, would so far deprive him of the rights of a free man, and would place him, as respects others, in a condition of servitude. A person allowed to pursue only one trade or calling, and only in one locality of the country, would not be, in the strict sense of the term, in a condition of slavery, but probably none would deny that he would be in a condition of servitude. He certainly would not possess the liberties nor enjoy the privileges of a free man. The compulsion which would force him to labor, even for his own benefit, only in one direction, or in one place, would be almost as oppressive, and nearly as great an invasion of his liberty, as the compulsion which would force him to labor for the benefit or pleasure of another, and would equally constitute an element of servitude." 83 U. S. 90, 21 L. Ed. 413.

That the rights to lease lands and to accept employment as a laborer for hire are fundamental rights, inherent in every free citizen, is indisputable; and a conspiracy by two or more persons to prevent negro citizens from exercising these rights because they are negroes is a conspiracy to deprive them of a privilege secured to them by the Constitution and laws of the United States, within the meaning of section 5508, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3712].

For these reasons, the demurrer to the indictment is overruled.