**UNITED STATES of America**

v.

**Fletcher HARVEY et al.**

**Civ. A. No. 3323.**

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Feb. 4, 1966.

Hugh Fleischer, Dept. of Justice, Washington, D. C., for plaintiff.

Stephen P. Dart, St. Francisville, La., for R. Harry Daniel, Sr., R. Harry Daniel, Jr., Edward I. Daniel, Jordan Truitt and Daniel and Truitt, Inc., defendants.

Leon A. Picou, St. Francisville, La., for Fletcher Harvey and Bertrand Haralson Barrow, defendants.

Fred Jackson, St. Francisville, La., for John Davis Spillman, defendant.

WEST, District Judge:

This suit is brought by the United States of America under the provisions of Title 42 U.S.C.A. Section 1971(b) and (c), and Public Law No. 89–110, 89th Congress, Section 11(b), commonly known as the Voting Rights Act of 1965. The United States seeks an injunction enjoining the defendants individually and all persons acting in concert with them from engaging in any acts, and specifically those herein complained of, designed to deprive Negro citizens of West Feliciana Parish, Louisiana, of the voting rights secured by the above mentioned laws. More specifically, the United States alleges that the defendants, for the purpose of interfering with the rights of Negroes to vote, have "subjected and threatened to subject Negro citizens to coercive and intimidatory economic penalties, which have included:

"(a) Notice of termination and termination of sharecropping and tenant farming relationships with Negro registrants;

"(b) Notice of eviction and eviction of Negro registrants from homes held under rental agreements;

"(c) The release of Negro registrants from salaried or other remunerative positions held on farms;

"(d) Imposing rents on houses which were formerly occupied in connection with sharecropping or tenant farming agreements."

Defendants, while admitting that some of their tenant farmers and day laborers have been discharged, deny that the termination of employment is in any way connected with any voting activities engaged in by those affected. They deny any violation on their part of the provisions of either Title 42 U.S.C.A. Section 1971, or of Public Law No. 89–110, 89th Congress, Section 11(b). All of the defendants further urge the unconstitutionality of the laws in question on the ground that their enforcement, in this instance, would violate the Fifth and Fourteenth Amendments to the United States Constitution by depriving them of their property and of the free use and exercise thereof without due process of law.

This suit was filed on December 17, 1965, at which time plaintiff's motion for the issuance of a temporary restraining order was denied and the case set for hearing on its motion for a preliminary injunction on December 23, 1965. In view of the fact that, when the hearing was held on December 23, all parties stated that they had introduced all of the evidence available to them, it was agreed that the Court would consider this hearing as a trial on the merits, and decide on this record whether or not plaintiff is entitled to the injunctive relief sought. Now, after carefully considering the record, including the exhaustive briefs filed by counsel for both sides, this Court concludes that, under the law, and for the following reasons, plaintiff cannot prevail herein.

The issues presented are several. First, does the Voting Rights Act of 1965 apply to individual action, or must it, constitutionally speaking, be limited in its application to state action; second, can the Voting Rights Act of 1965, without running afoul of the United States Constitution, be so construed and applied as to prevent a private individual from evicting tenants from his privately owned property for whatever reason he may wish to do so; and third, if it be held that the Voting Rights Act can be so construed and applied, does the evidence in this case justify a holding that these particular defendants are in violation of Section 11(b) of that Act.

The United States seeks injunctive relief on the ground that the action of the defendants, in evicting certain tenants from their properties, constitutes a violation of Title 42 U.S.C.A. Section 1971(b), and Section 11(b) of Public Law 89–110, 89th Congress, commonly known as the Voting Rights Act of 1965.

Section 42 U.S.C.A. § 1971(b) provides:

"(b) No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, presidential elector, Member of the Senate, or Member of the House of Representatives, Delegates or Commissioners from the Territories or possessions, at any general, special, or primary election held solely or in part for the purpose of selecting or electing any such candidate."

Section 11(b) of the Voting Rights Act of 1965 provides:

"No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under Section 3(a), 6, 8, 9, 10, or 12(e)."

The first question to be decided is whether or not these quoted provisions of federal law can be so construed as to prohibit purely individual acts of discrimination as distinguished from state action amounting to discrimination. If they purport to prohibit individual discriminatory acts, we must decide whether or not the prohibition contained in the Voting Rights Act is directed to the right to vote in state and local elections as well as in federal elections, and, if so, whether or not such a prohibition is within the power of Congress to decree. Since the specific provisions of 42 U.S. C.A. Section 1971(b), relied on herein by plaintiff are so similar in effect to the provisions of the Voting Rights Act relied upon, a determination of the validity of petitioner's contentions under the latter will suffice in determining the issues presented in this case.

The very title of the Voting Rights Act itself leaves no doubt but that this Act was passed by Congress under its assumption that its authority to do so was contained in the Fifteenth Amendment to the United States Constitution. The Act is entitled "To Enforce the fifteenth amendment to the Constitution of the United States, and for other purposes." In addition thereto, reference to the Act itself clearly shows by its repeated reference to the Fifteenth Amendment that that Amendment is considered to be the source of congressional power to enact this legislation. It is repeatedly stated throughout the Act that its purpose is "to enforce the guarantees of the Fifteenth Amendment."

The Fifteenth Amendment to the United States Constitution provides:

"Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

"Section 2. The Congress shall have power to enforce this article by appropriate legislation."

It has been repeatedly, consistently, and unequivocally held that the prohibition contained in the Fifteenth Amendment is directed solely at action "by the United States or by any State" and not at action by the individual. James v. Bowman, 190 U.S. 127, 23 S.Ct. 678, 47 L.Ed. 979 (1903); Brawner v. Irvin, 169 F. 964 (N.D.Ga.1909); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152, rehearing denied, 345 U.S. 1003, 73 S. Ct. 1128, 97 L.Ed. 1408 (1953); United States v. Amsden, 6 F. 819 (D.C.Ind. 1881); United States v. Morris, 125 F. 322 (E.D.Ark.1903); Karem v. United States, 121 F. 250, 61 L.R.A. 437, (C.A. 6, 1903); Hawkins v. North Carolina Dental Society, 230 F.Supp. 805 (W.D. N.C.1964); and Paynes v. Lee, 239 F. Supp. 1019 (E.D.La.1965).

In James v. Bowman, supra, the United States Supreme Court was considering the constitutionality of an act of Congress, U.S.Rev.Stat. § 5507 (U.S.Comp. Stat.1901, p. 3712), which provided:

"Sec. 5507. Every person who prevents, hinders, controls, or intimidates another from exercising, or in exercising the right of suffrage, to whom that right is guaranteed by the Fifteenth Amendment to the Constitution of the United States, by means of bribery or threats of depriving such person of employment or occupation, or of ejecting such person from a rented house, lands, or other property, or by threats of refusing to renew leases or contracts for labor, or by threats of violence to himself or family, shall be punished as provided in the preceding section."

In the course of its opinion, the United States Supreme Court said:

"The single question presented for our consideration is whether § 5507 can be upheld as a valid enactment, for, if not, the indictment must also fall, and the defendant was rightfully discharged. On its face the section purports to be an exercise of the power granted to Congress by the 15th Amendment, for it declares a punishment upon anyone who, by means of bribery, prevents

another to whom the right of suffrage is guaranteed by such amendment from exercising that right. But that amendment relates solely to action 'by the United States or by any state,' and does not contemplate wrongful individual acts."

Then, after analogizing the Fifteenth Amendment to the Fourteenth Amendment, the Court said:

"But we are not left alone to this reasoning from analogy. The 15th Amendment itself has been considered by this court, and the same limitations placed upon its provisions. In United States v. Reese, 92 U.S. 214, 217, 23 L.Ed. 563, 564, we said:

" 'The 15th Amendment does not confer the right of suffrage upon anyone. It prevents the states, or the United States, however, from giving preference, in this particular, to one citizen of the United States over another on account of race, color or previous condition of servitude. Before its adoption this could be done. * * *'

"These authorities show that a statute which purports to punish purely individual action cannot be sustained as an appropriate exercise of the power conferred by the 15th Amendment upon Congress to prevent action by the state through some one or more of its official representatives * * *."

In *Bowman*, it was argued that the Congress had ample power under the Fifteenth Amendment to enact a penal statute providing punishment for anyone who commits bribery in connection with elections of representatives in Congress. In passing upon this contention, the Court said:

"The difficulty with this contention is that Congress has not by this section acted in the exercise of such power. It is not legislation in respect to elections of Federal offices, but is leveled at all elections, state or Federal, and it does not purport to punish bribery of any voter, but simply those named in the 15th Amendment. On its face it is clearly an attempt to exercise power supposed to be conferred by the 15th Amendment in respect to all elections, and not in pursuance of the general control by Congress over particular elections."

And then, commenting on its prior decision in the case of United States v. Reese, 92 U.S. 214, 23 L.Ed. 563, the Court said:

" 'We are, therefore, directly called upon to decide whether a penal statute enacted by Congress, with its limited powers, which is in general language broad enough to cover wrongful acts without as well as within the constitutional jurisdiction, can be limited by judicial construction so as to make it operate only on that which Congress may rightfully prohibit and punish. For this purpose, we must take these sections of the statute as they are. We are not able to reject a part which is unconstitutional and retain the remainder, because it is not possible to separate that which is unconstitutional, if there be any such, from that which is not. The proposed effect is not to be obtained by striking out or disregarding words that are in the section, but by inserting those that are not now there. Each of the sections must stand as a whole or fall altogether. * * *' "

Continuing, in the *Bowman* case, the Court said:

"We are fully sensible of the great wrong which results from bribery at elections, and do not question the power of Congress to punish such offenses when committed in respect to the election of Federal officials. At the same time it is all important that a criminal statute should define clearly the offense which it purports to punish, and that when so defined it should be within the limits of the power of the legislative

body enacting it. Congress has no power to punish bribery at all elections. The limits of its power are in respect to elections in which the nation is directly interested, or. in which some mandate of the national Constitution is disobeyed; and courts are not at liberty to take a criminal statute, broad and comprehensive in its terms and in these terms beyond the power of Congress and change it to fit some particular transaction which Congress might have legislated for if it had seen fit."

 And thus we see that as the law presently stands, there is simply no doubt that the Fifteenth Amendment relates only to action by the United States or by a particular state, and not to individual action. We must further conclude that even if it be assumed that Congress has the power to punish individual action as it relates to federal elections, it has no such power as it relates to state elections. And lastly, we must conclude that in any event, Congress, with its limited powers, may not legally enact a statute which is in general terms broad enough to cover wrongful acts without as well as within the constitutional jurisdiction and then leave it to the courts to determine who may be rightfully punished under the act and who should be held to have been improperly included within its terms. If Congress wishes to enact legislation pursuant to the Fifteenth Amendment, it must limit such legislation to those matters over which the amendment gives it power to legislate. Such legislation must be consonant with the well established principles that the Fifteenth Amendment is directed solely at action by the United States or by a state and not at individual action, and that the power of Congress to punish for offenses committed in connection with the right to vote is limited to elections of federal officials.

Whether or not it was wise for the framers of the Constitution to so limit the powers of Congress is not for this or any other Court to decide. The fact remains that they did. No amount of legal double talk can now alter the fact that these principles have been settled beyond question by repeated pronouncements of the United States Supreme Court. The wording of neither the United States Constitution itself nor of the Fifteenth Amendment thereto has been changed one iota since these deliberate pronouncements of the Court, and, consequently, either a frank and complete repudiation by the Supreme Court of its prior interpretations of these provisions or a constitutional amendment, properly adopted, would be necessary to change these well established principles of law.

So, assuming as we must that the pronouncements of the United States Supreme Court, as they pertain to the interpretation of the Constitution and laws of the United States, constitute the law of the land, we must examine the present Voting Rights Act in light of those pronouncements.

Section 11(b) of the Voting Rights Act, pursuant to which this action is brought, is, in some respects, a broader statute than that considered in *Bowman.* At least in the statute involved in *Bowman,* Congress made an effort to limit the proscribed actions to those affecting the right of suffrage "to whom that right is guaranteed by the Fifteenth Amendment to the Constitution of the United States." The statute presently under consideration contains no such limiting language. It attempts to forbid certain action by individuals as well as state action designed to intimidate, threaten, or coerce any person from "urging or aiding any .person to vote or attempt to vote * * *." When this section is read with the remainder of the Act, there can be no doubt but that it has reference to voting in *any* election, federal, state or local. For example, Section 4(a) states " * * * no citizen shall be denied the right to vote in any Federal, State or local election because of his failure to comply with any test or device * * *"; Section 4(e) (2) says that "No person * * * shall be

denied the right to vote in any Federal, State or local election because of his inability to read, write, understand, or interpret any matter in the English language, * * *." Sections 7(b) and 8 refer to "any election," while other sections, such as the one here involved, simply refer to persons "attempting to vote." Thus, it is apparent that the Act concerns itself specifically with the right to vote in *all* elections, federal, state and local, and as is evidenced by the title of the Act itself, as well as by the repeated references to the Fifteenth Amendment in Sections 3(a), (b), (c), 6, etc., the Act was passed pursuant to authority that Congress assumed it was given by the Fifteenth Amendment. While the penal provision contained in Section 11(c) of the Act confines its applicability to elections of federal officials, no such limitation is placed upon the penal provision of Section 12(a). Thus, it is plain to see that the statute passed by Congress pursuant to what it believed to be its authority under the Fifteenth Amendment attempts to set up standards for voting requirements in federal, state and local elections, and also attempts to provide penal sanctions for violations of the Act by individuals as well as by states and state officials. There is nothing contained in the statute considered by the Supreme Court in the *Bowman* case that could be considered more violative of the United States Constitution than is contained in the present Act. As a matter of fact, the present Act, being more general in its terms, and broader in scope, must be considered more flagrantly violative of the Constitution than was the prior statute. Congress simply does not have the power, under the authority granted it by the Constitution, to provide for the punishment of purely individual actions tending to interfere with a person's right to vote in state or local elections. When an act of Congress attempts to do this, it is no less unconstitutional because it also provides for protection of one's right to vote in federal elections. James v. Bowman, supra.

Thus, it must be concluded that, to say the least, Sections 11(b) and 12(a) of the Voting Rights Act of 1965, insofar as they purport to proscribe individual acts of discrimination, and to punish individuals for purely individual acts of discrimination against persons exercising or attempting to exercise their right to vote in state or local elections is violative of the United States Constitution and thus unenforceable. And they are no less unenforceable merely because they include within their purview prohibitions against the same acts engaged in in federal elections. James v. Bowman, supra. However unwise or illadvised these limitations on the power of Congress may be, they are nonetheless real and present and have been expressly recognized and affirmed in clear and concise language by the Supreme Court of the United States.

But even if it were held that Sections 11(b) and 12(a) were constitutionally acceptable, there is still a grave question as to whether or not the action of the defendants in this case, even if proved by a preponderance of the evidence, could be considered to be violative of Section 11(b) of the Act. It is interesting to note that the statute involved in *Bowman* specifically provided that "every person who prevents, hinders, controls, or intimidates another from exercising * * * the right of suffrage * * * by means of * * * depriving such person of employment or occupation, or of ejecting such person from a rented house, lands, or other property, or by threats of refusing to renew leases or contracts for labor * * * shall be punished * * *," etc. The United States Supreme Court in *Bowman* specifically declared this provision unconstitutional, stating:

> "But that amendment relates solely to action 'by the United States or by any state,' and does not contemplate wrongful individual acts."

We need but to reflect on other rights specifically guaranteed by the United States Constitution to recognize the wis-

dom of this holding. For if we were to hold for one fleeting moment that, even to protect one's right to vote, a person could, in effect, be deprived of his right to the undisturbed ownership, possession and use of his own private property, we would be abrogating much more of the Constitution than we would be preserving. It has been held from time immemorial in this country that the right to possess and acquire property is so fundamental that it is not dependent upon the Constitution of the United States or the Federal Government for its existence. Culp v. United States, 131 F.2d 93 (C.A.8, 1942); Hodges v. United States, 203 U.S. 1, 27 S.Ct. 6, 51 L.Ed. 65 (1906). But despite this fact, the United States Constitution does provide, in very exacting terms, for the right to complete ownership and use of private property. Thus, the Third Amendment provides that no soldier shall, in time of peace, be quartered in any house without the consent of the owner; the Fourth Amendment protects the right of the people to be secure in their persons and houses against unreasonable search and seizure; the Fifth Amendment provides that no person shall be deprived of his property without due process of law and that no private property shall be taken even for public use without just compensation; the Ninth Amendment provides that the enumeration in the Constitution of certain rights shall not be construed to deny or disparage others retained by the people; and the Fourteenth Amendment provides that no state shall deprive any person of his property without due process of law. There are as many provisions in the Constitution of the State of Louisiana also designed to protect one's right to the undisturbed use and enjoyment of his private property. As stated by the United States Supreme Court in Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917):

"Property is more than the mere thing which a person owns. It is elementary that it includes the right to acquire, use, and dispose of it.

The Constitution protects these essential attributes of property. * * * Property consists of the free use, enjoyment, and disposal of a person's acquisitions without control or dimunition saved by the law of the land."

See also United States v. General Motors Corporation, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945); United States v. Finn, 127 F.Supp. 158 (S.D.Cal.1954), modified 239 F.2d 679 (9 Cir. 1956); Collier v. California Company, 73 F.Supp. 413 (W.D.La.1947); Amerada Petroleum Corp. v. Reese, 195 La. 359, 196 So. 558 (1940).

Judge Wisdom, speaking for the Fifth Circuit Court of Appeals in United States v. Lutz, 295 F.2d 736 (1961), said:

"Ownership of property comprises numerous different attributes. The owner has the right to use and control property, to exclude others from the use of it, and to sue to regain possession from one who has taken it without permission or to obtain damages from one who has injured it."

See also Dairy Queen of Oklahoma v. Commissioner of Internal Revenue, 250 F.2d 503 (C.A.10, 1957), and Henneford v. Silas Mason Company, 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937). In speaking of an individual's right to the use, even if discriminatory, of his private property, the United States Supreme Court said in Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948):

"Since the decision of this Court in the Civil Rights Cases * * * the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful.

"We conclude, therefore, that the restrictive agreements standing alone cannot be regarded as a viola-

tion of any rights guaranteed to petitioners by the Fourteenth Amendment."

In Martin v. Monmouth Park Jockey Club, 145 F.Supp. 439 (D.C.N.J.1956), affirmed 242 F.2d 344 (C.A.3, 1957), where a jockey was complaining about being excluded from the track, the Court said:

"Although it is intensely regulated, the defendant Club is a private organization. Nothing is more elementary than its right as a private corporation to admit or exclude any persons it pleases from its private property, absent some definite legal compulsion to the contrary."

In Schneider v. District of Columbia, 117 F.Supp. 705 (D.C.D.C.1953), modified on other grounds, Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), it was stated:

"There is no general power in government, in the American concept, to seize private property. Hence it is universally held that the taking of private property of one person for the private use of another violates the due process of law clause of the Fifth and Fourteenth Amendments."

It is plaintiff's contention in this case that the actions of the defendants in terminating certain sharecropping agreements with various tenants, and, in some instances, in terminating day labor arrangements, and, in one instance, in requiring that a monthly rental be paid for a house in which, in the past, the tenant, while performing work for the owner was required to pay no rent, constitute violations of Section 11(b) of the Voting Rights Act, and that this Court should issue an injunction which, in effect, would require these defendant landowners to continue each year to renew their sharecropping agreements with these tenants; to refrain from evicting tenants from their property; to refrain from firing day laborers; and to refrain from charging what plaintiff considers to be unreasonable rent for tenant houses. Plaintiff contends that it has shown that these things have been done by these defendants for the sole purpose of intimidating, threatening and coercing certain tenant farmers who have registered to vote in West Feliciana Parish, and that, therefore, these actions constitute violations of Section 11(b) of the Voting Rights Act.

■ Even assuming that these acts have been committed by the defendants for the purposes stated by the Government, this Court is of the opinion that the relief sought by the plaintiff is still not available. Even assuming that the Congress does have the power under the Fifteenth Amendment to legislate against individual discriminatory acts committed in the course of state or local elections, its power is still limited by Section 2 of the Fifteenth Amendment wherein it is provided that "the Congress shall have power to enforce this article by *appropriate legislation*." There is simply no way that legislation allegedly designed solely to protect the constitutionally guaranteed right to be free from discrimination in the exercise of the franchise, which, in its operation, confiscates one's use of his private property and awards it to another as a penalty for the owner's individual acts of discrimination could be considered constitutional. Two wrongs simply do not add up to one right, nor do the exigencies of the moment justify the enactment of legislation which, if allowed to become effective, could and would abrogate the long cherished right of free citizens, in a free society, to "use and control the property, to exclude others from the use of it, and to sue to regain possession from one who has taken it without permission or to obtain damages from one who has injured it." United States v. Lutz, supra. To hold in this case as the Government would have this Court hold would be tantamount, in some instances, to granting a life estate to one person in the property of another simply because the owner thereof, on a purely individual basis, objected to the granting to everyone, regardless of his literacy or illiteracy, the right to vote. Such legislation would not, by any stretch of logic or rea-

son, be "appropriate legislation" as contemplated by Section 2 of the Fifteenth Amendment to the United States Constitution. The right of citizens in this country to the undisturbed use and control of their private property is entirely too sacred to be so easily extinguished. Nowhere in the Constitution of the United States can be found any such grant of power to Congress to enable it, by legislation designed merely to protect the right to be free from discrimination in the exercise of the franchise, to thus deprive individuals of their exclusive use of their privately owned property. Unless this property is, by due process of law, taken for public use, the owner thereof has the unqualified right to exclude others from the use thereof for whatever reason he may wish to do so. This right is certainly as basic and fundamental as are certain other rights zealously guarded and protected by the courts, such as freedom of speech, freedom of the press, freedom of religion, and freedom to peaceably assemble and to petition for the redress of grievances.

■ Lastly, while firmly believing that the foregoing completely disposes of this case, since upon the hearing held herein all available testimony and evidence was produced and heard, in an effort to eliminate any possibility of piecemeal hearing or appeal, I will now discuss the merits of this case. Even if we assume that I am wrong in my holdings thus far, and that the statute involved was passed by Congress in a proper exercise of its authority under the Fifteenth Amendment, under the circumstances of this case, I must still hold that the plaintiff is not entitled to the relief sought. The plaintiff has simply failed to prove, by a preponderance of the evidence, the allegations of its complaint.

■ In a civil suit such as this, the plaintiff must prove all essential elements of its case by a preponderance of the evidence, and it must prove that it has a clear right to the injunctive relief sought. Allen v. Pyrene Manufacturing Company, 111 F.Supp. 819 (D.N.J.1953); Walling v. California Conserving Company, 74 F.Supp. 182 (N.D.Cal.1945), affirmed McComb v. Hunt Foods, 9 Cir., 167 F.2d 905, cert. denied 335 U.S. 845, 69 S.Ct. 69, 93 L.Ed. 395; Bowles v. Luboil Heat & Power Corporation, 55 F.Supp. 703 (E.D.N.Y.1944); Bowater Steamship Company v. Patterson, 303 F.2d 369 (C.A.2, 1962), cert. denied 371 U.S. 860, 83 S.Ct. 116, 9 L.Ed.2d 98.

As was said in United States v. Board of Education of Greene County, Mississippi, 332 F.2d 40 (C.A.5, 1964):

"After full and extensive findings of fact the Court reached the legal conclusion that the appellant was not entitled to the relief sought and declined to issue a mandatory injunction as prayed for in the complaint. The rule applicable to injunctions was announced early in the history of this country by Justice Baldwin, sitting at Circuit in 1830 in Bonaparte v. Camden (C.C.N.J.1830), Fed. Cases No. 1617: 'There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing of an injunction; * * *.' The rule applicable to the Fifth Circuit was succinctly stated by Judge Hutcheson in Reliable Transfer Company v. Blanchard (5th Cir. 1944), 145 F.2d 551.

'In this arguing, appellant proceeds upon the wholly incorrect assumption that, conceding power, the issuance of the injunction was mandatory. It is hornbook law that "Courts of equity exercise discretionary power in the granting or withholding of their extraordinary remedies, and that although this discretionary power is not restricted to any particular remedy, it is particularly applicable to injunction since that is the strong arm of equity and calls for great caution and deliberation on the part of the court. (Citing cases.) Here again it is hornbook law that whether an injunction will or will not issue rests within

the sound discretion of the court, and that the exercise of this discretion will not be disturbed unless there has been a clear abuse of it, 45 Am.Jur., Sec. 180, p. 936.' "

■ In deciding whether or not an injunction will issue, the Court must consider carefully whether or not the alleged improper action complained of has been proved by a preponderance of the evidence, and whether or not the plaintiff has, by a preponderance of the evidence, established an urgent necessity for its issuance. Clark v. Thompson, D.C., 206 F.Supp. 539, affirmed 313 F.2d 637 (C.A. 5, 1963), cert. denied 375 U.S. 951, 84 S.Ct. 440, 11 L.Ed.2d 312. The plaintiff in the present case has woefully failed to carry its burden of proving by a preponderance of the evidence, the essential elements of its case. While being reluctant to burden this already lengthy opinion with excerpts from the testimony in this case, I feel nevertheless compelled to do so in order that a complete picture of this entire matter might be available to those who might be called upon to review it.

It will be recalled that the Government, in this suit, charges that the defendants, for the purpose of interfering with the rights of Negro citizens to vote, have subjected and threatened them to coercive and intimidatory economic penalties which have included, to quote from plaintiff's complaint:

"(a) Notice of termination and termination of sharecropping and tenant farming relationships with Negro registrants;

"(b) Notice of eviction and eviction of Negro registrants from homes held under rental agreements;

"(c) The release of Negro registrants from salaried or otherwise remunerative positions held on farms;

"(d) Imposing rents on houses which were formerly occupied in connection with sharecropping or tenant farming agreements."

■ In support of its contentions, the Government called thirteen witnesses, twelve of whom testified that they had received notices evicting them from their premises as of January 1, 1966. The Government's case seems to be based upon the fact that it believes this Court should conclude that these tenants were evicted as reprisals for their having registered to vote. That is what the Government charges. But the testimony which they adduced at the trial simply does not prove those allegations by anything like a preponderance of the evidence. This Court must accept the unrefuted evidence of witnesses who testify under oath unless there is some clear showing why it would be unjust to do so. Where the plaintiff's right to the relief sought depends upon the existence of a particular fact being inferred from proven facts, such inference is not permissible in the face of positive or otherwise uncontradicted testimony of unimpeached witnesses whose testimony is consistent with the facts actually proven, and which uncontradicted evidence shows affirmatively that the facts sought to be proved did not exist. Pennsylvania Railroad Company v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819; Texas Company v. Hood, 161 F.2d 618 (C.A.5, 1947), cert. denied 332 U.S. 829, 68 S.Ct. 206, 92 L.Ed. 403. In order for this Court to infer the facts which plaintiff alleges from the testimony adduced, it would be necessary that the Court reject the testimony of practically all of the plaintiff's own witnesses. Since the credibility of the plaintiff's witnesses, with one or two exceptions, was not brought in question, this Court may not arbitrarily reject the testimony of those witnesses in order to infer the facts which the plaintiff sought to prove. Gee Chee On v. Brownell, 253 F.2d 814 (C.A.5, 1948); United States v. Johnson, 208 F.2d 729 (C.A.5, 1953); Stone v. Stone, 78 U.S.App.D.C. 5, 136 F.2d 761 (1943); N. L. R. B. v. Ray Smith Transport Company, 193 F.2d 142 (C.A.5, 1951). It is true the twelve out of the thirteen witnesses called by the Govern-

ment testified that they had, sometime during the summer or early fall of 1965, registered to vote, and that all of them had, prior to January 1, 1966, received notices to vacate the premises on which they were living by January 1. One witness testified that she had not registered to vote, and that she had not received an eviction notice. Based upon these generalizations alone, the Government urges this Court to hold that it has proved, by a preponderance of the evidence, that the defendants are guilty of a violation of the Voting Rights Act of 1965 in that they "intimidated" and "coerced" these Negroes because of their voting activities, i. e., because they registered to vote. It must be noted that the prohibition contained in Section 11(b) of the Voting Rights Act is not against evicting tenants, but is against intimidating, threatening, or coercing a person for exercising the rights accorded him by the Voting Rights Act. Consequently, it is obviously not enough for the Government to prove that these tenants were evicted. It must prove, by a preponderance of the evidence, that the evictions were a form of intimidation, threat, or coercion. This it has failed to do as is evident when the testimony of these witnesses is examined.

■ The evidence shows that all of the thirteen people who testified for the Government were either sharecropping tenants on lands belonging to the various defendants, or were farmers who worked some of the land for these various defendants and resided elsewhere. The thirteen Negroes who testified constitute a very small portion of the total number of people who work for these defendants. For example, the defendant, Daniel and Truitt, Inc., alone employ some two hundred to three hundred workers during the year on their various farm properties. While eight of their tenants received eviction notices, the testimony established that there were a total of thirty-eight tenant farmers living on their property, twenty-seven of whom were registered to vote. The fact that some of these tenants had resided on the property of the vari-

ous defendants for long periods of time, some as long as sixty years or more, is immaterial. Under Louisiana law, sharecropping agreements generally run from year to year, as do leases of farm property. A landowner may terminate a sharecropping agreement or a rural lease at any time by giving notice at least thirty days before the end of the rent year. If he fails to do so, then the lease is automatically renewed for an additional year, and the landowner would be required to wait until the end of the next year before giving notice to vacate. All of the notices sent to these twelve witnesses were sent in accordance with Louisiana law, and, under normal circumstances, there is no question but that these defendants had the right to terminate, as they did, the sharecropping agreements and house rental agreements with these tenants. The eviction notices gave no reason for the termination other than that the crop year was up and that the owner of the property did not wish to renew the agreements. The question is, assuming that Section 11(b) of the Voting Rights Act is a valid, constitutional exercise of the power of Congress, did these evictions constitute a violation of that section of the Act. In order for it to constitute a violation, the plaintiff had the burden of proving, by a preponderance of the evidence, that the evictions were a form of intimidation, threat, or coercion. There was not one single bit of evidence introduced by the plaintiff to substantiate this allegation. Nowhere in the testimony of these witnesses will it be found that these tenants were in any way threatened, intimidated or coerced by these defendants.

The first witness to testify was Henry Cummings. He testified that he lived on property owned by Daniel and Truitt, Inc. While he testified that at the time he registered, the defendant, Mr. Fletcher Harvey, who was registrar of voters in West Feliciana Parish, told him that he was "mighty scared some of you all will have to move," he was very emphatic in his testimony that as far as he knew, his landlord, Daniel and Truitt, Inc., did

not even know he had registered to vote, and that they had never, in any way, threatened or coerced him in any way whatsoever, and that they had never mentioned voting activities to him at all. He further testified that he had never talked with Mr. Harvey at any time about voting other than the brief conversation referred to.

The next witness was George Gains, who lived on property of Daniel and Truitt, who when questioned by the Court testified as follows:

"Q. Do you know why you were told to move off this place?

A. No, sir, I do not.

Q. Do you have an idea why you were told to move off this place?

A. No, sir, I don't. He never told me.

Q. No one has ever told you why?

A. No one. He said he wanted the house by the first of January, that's all. Just said he wanted the house by the first of January and that's all."

The next witness was Carrie Williams who, on cross-examination, testified as follows:

"Q. Did Mr. Daniel ever say anything to you about registering?

A. No, he has not.

Q. Did Mr. Harry Daniel ever say anything to you about registering?

A. No.

Q. Did Mr. Harry, Jr., ever say anything to you about registering?

A. No.

Q. None of them did?

A. Ain't nobody of them said nothing to me about registering.

Q. Mr. Fletcher didn't say anything to you about registering?

A. No. When I went in to register—when he went to register

me, he didn't say anything, but asked me questions like, say, it was the first time I ever be registered, I guess, and he questioned me. That's the questions he asked.

Q. That is all that was asked? He didn't say you would have to move?

A. No."

And when questioned by the Court, this witness said:

"Q. Do you know why they are asking you to move off of this place?

A. Well, no, sir, I don't know. It took me off my feet when he said I had to move. I don't know what caused it. We ain't had no falling out, no words. I don't know nothing.

Q. Do you have any idea why they are asking you to move by January 1?

A. I don't know.

Q. You can speak up. You are here to tell me your story as to this thing, and that is what this hearing is for. Did anyone give you any idea why you are being asked to vacate this place?

A. I don't know. I tell you the truth. I don't know.

Q. Do you think it is because you registered to vote?

A. Did I ever—

Q. Do you think it's because you registered to vote?

A. It could be; that is the only thing I see here.

Q. Has anyone said anything to indicate that?

A. No, no one said nothing to me. Ain't got on to me about voting or nothing.

Q. Did anyone tell you that if you registered to vote or if you

voted in any election, that they would put you off this place?

A. No, they didn't.

Q. Did anyone at all give you any indication that they would do anything to you at all if you voted or registered to vote?

A. No, sir.

Q. All you know is that you got a letter saying that the crop year was up and that you had to move?

A. Yes, sir."

With the one or two exceptions here-inafter noted, that is the type of testi-mony given by each of the plaintiff's twelve witnesses. This Court went out of its way to question each of the wit-nesses, and to actually solicit statements from them that would indicate that they had in some way been intimidated or coerced. Despite the invitation to so testify, no such testimony was given. It would be useless to quote, in this opinion, all of the testimony of each of these witnesses, because it would be repetitious of that which has already been quoted. Neither under direct examination by the Government's attorney, under cross-ex-amination by defense counsel, nor under interrogation by this Court did these plaintiff's witnesses bear out the allega-tions of the plaintiff's complaint.

When the witness Willie London testi-fied, he stated that when he went to the registrar's office to register, Mr. Har-vey said, "Willie, what the hell you do-ing here?" He replied, "I come to regis-ter, Mr. Fletcher." He stated that Mr. Harvey then said, "Well, I feel sorry for you poor colored people." He then stated that he paid no attention to what Mr. Harvey said, because it was not unusual for Mr. Harvey to talk like that. It is important, however, to note that, when questioned by the Court, this witness said:

"Q. Mr. London, do you know what they are putting you off this place for?

A. No, sir.

Q. Has anyone given you any idea why?

A. No.

Q. Why are you being asked to move off this place?

A. No.

Q. Has anyone, including Mr. Harvey, threatened you in any way or said anything to you about if you voted or if you registered, you would have to move, but if you didn't vote or didn't register, that you could stay? Has anyone told you that? Did Mr. Daniel or Mr. Truitt tell you that if you would not vote that you could stay where you were?

A. No, sir. They ain't never told me nothing about staying where I was already if I regis-tered.

Q. Do you have any idea why you are being put off this place?

A. No, sir, I sure don't.

Q. Are you here to make a claim that you are being put off be-cause of your voting activities, or are you claiming that that is why you were put off of this place?

A. I can't say that. I could not say that and feel myself quali-fied, you know.

Q. Do you think that that is why they did it?

A. Well, I don't know. I guess so."

The next witness, Frank Cummings, said:

"Q. Did any of the defendants tell you that if you registered you would have to move?

A. No, none of them.

Q. Did any of them tell you that if you didn't register, or even if you did register but didn't vote, that you would not have to move?

A. No, sir, none of them told me that.

Q. Do you have any idea why you were asked to move off that place?

A. No, sir, I don't have any at all.

Q. All you know is that you got a notice?

A. I got a notice to move by January 1."

On several occasions, during questioning by the Court, the Court inquired of these witnesses as to whether or not they were in any way afraid to testify in Court and to tell the Court all that they knew about these eviction notices. These witnesses were frank, and outspoken, and insisted, as was quite obvious to the Court, that they had no fear of testifying as to anything pertinent, and that they were, in fact, telling the truth as far as they knew it.

Lucille McGuffie testified that she had not registered to vote, and had not received an eviction notice, but the testimony of Mr. Daniel, of Daniel and Truitt, was to the effect that an eviction notice had in fact been prepared, but that Lucille McGuffie was not at home when he delivered the notices, and by the time he found her at home, it was too late to give her the notice within the thirty-day period required.

While Nolan Jones, who lived on property belonging to the defendants, John Spillman and Earl Spillman, stated that one of the Spillman brothers had said something to him one day, about not wanting to furnish a man a house who was "following the teachings" of CORE (Congress of Racial Equality), he further testified that the remarks were directed not at him, but to his stepson-in-law, Oscar Landry, who was not called as a witness in this case. Under cross-examination, it was brought out that this witness had originally moved onto the Spillman property with nine of his children. He never did farm but was allowed to live in the house as long as his children worked on the place. One by one his children, of their own accord, had left the property, and finally, when the last child had left the farm in April

of 1965, Mr. Spillman had notified Jones that from then on he must pay rent at the rate of $10 per month. He testified that neither John Spillman nor Earl Spillman at any time told him that if he registered to vote he would have to leave, or that if he did not register to vote he could remain. Mr. John Spillman testified that he did not, in fact, know whether or not Nolan Jones was even registered to vote, and he denied strenuously ever having discussed the question of voter registration with him. He stated that he asked him to leave because there was no one in the family working on the place, and that he no longer wished to rent his property to a non-working tenant. When questioned by the Court, Nolan Jones testified as follows:

"Q. Do you have any idea why he told you to move?

A. No, I couldn't say that. I couldn't tell you.

Q. Have you heard anything among the people up there or anything that would lead you to believe that he told you to move because you had registered to vote? That is what I am trying to find out.

A. No.

Q. Have you since heard about it? I am trying to have you tell me what this is all about; that is what I am here for.

A. I told you as far as I heard and know; that is all I know about it.

Q. And you are unable to say under oath that you have reason to believe that you were told to move because of your voting activities?

A. No, I wouldn't say that."

And so it goes. Witness after witness after witness testified emphatically to the effect that their voting activities, as far as they knew, had nothing whatsoever to do with their eviction.

While the witness Sullivan Johnson, on direct examination, indicated that one

of the Spillman brothers had mentioned something about his voting activities, it developed upon further examination that when the Spillman brothers purchased the property in question some three years ago, they immediately advised Sullivan Johnson that he could remain on the property for only one year because of the fact that at the end of the first year they, the Spillman brothers, were going to discontinue all row crop farming and convert their property entirely to pasture. It was pursuant to this arrangement that Sullivan Johnson was asked to leave. He frankly admitted this on cross-examination.

The plaintiff produced as a witness one Edna London who, it alleged, had been a tenant on the property of the defendant, Fletcher Harvey, and who, because of her voting activities, had been notified that in the future she would have to pay $25 per month rent for the house in which she lived, as compared with no rent being charged prior to her having registered to vote. The testimony of Edna London simply did not bear out this allegation. Edna London frankly testified that while she worked for Mr. Harvey, she did both farming and housework, and as part of her remuneration, she was given a house in which to live. This witness testified that she is the unwed mother of fourteen illegitimate children, and that as long as she worked for Mr. Harvey she had been given her house rent free. In September of 1965, she voluntarily quit working for Mr. Harvey because she said she was dissatisfied with her job. The evidence showed that Mr. Harvey still, at the time of this hearing, was willing to give her the house in which she lived, rent free, if she would resume working for him as she had before. This offer was reiterated by Mr. Harvey in Court, and the Court asked this witness whether or not she was desirous of accepting the offer. The witness testified:

"Q. When did you quit work for Mr. Harvey?

A. I worked one day in September.

Q. Why did you leave?

A. Well, I will tell you why I did leave, I was sick and I had stopped work. I went back to work and I just didn't feel so satisfied. I figured after I rested he would tell me he didn't need me.

Q. So before he told you so, you quit of your own?

A. On my own.

Q. You were not forced to leave your job at all?

A. No, I was not.

Q. Mr. Harvey did not make you leave the job?

A. No, he did not.

Q. You could still have been there if you wanted to right now?

A. Yes, sir.

Q. And if you stayed there and still worked around the house you knew then that you would not have to pay any rent?

A. I figured. I didn't know that. I figured I would still be farming because I didn't know he didn't intend to farm.

Q. And when you quit work it was your idea to quit work and not his?

A. That's right.

Q. So you are not claiming that you were put out of a job there because of any voting activities or anything like that?

A. No, I was not.

Q. The only thing you know is that after you quit work and were not doing any work for Mr. Harvey at all that he told you that the rent would be $25 a month?

A. That's right.

Q. Is that right?

A. That's right.

Q. And so you have not been deprived of any opportunity to work for Mr. Harvey that you know of?

A. No, sir."

This Court, in all probability, should have granted an involuntary dismissal at the close of the plaintiff's case because, as can be seen by this sample of the evidence, there was certainly not sufficient evidence upon which this Court could have granted a judgment in favor of the plaintiff. However, out of an abundance of caution, and in order that the record might be complete, the Court required the defendants to produce their evidence. All of the defendants testified, and as will be seen by reference to their testimony, the denials by plaintiff's witnesses of any threats, intimidation or coercion were certainly corroborated. The defendants gave ample, unrefuted testimony of logical, legitimate reasons for evicting the tenants in question, none of which in any way could be construed as intimidation, coercion or threats, as contemplated by Section 11(b) of the Voting Rights Act. Not only Mr. Fletcher, but also Mr. Daniel, offered to re-employ some of these tenants if they were able to furnish their own transportation to and from the house in which they lived to the areas that would be available for them to farm. The evidence reflects that there are many registered voters still working on the properties of these various defendants, and there simply is no evidence to show that the evictions in question constituted any intimidation, threats or coercion on the part of these defendants.

A review of the documentary evidence filed in this record reveals that during the year 1965 Daniel and Truitt had a total of fifty-nine Negro sharecroppers farming on their properties. Some were tenants living on the property, and some were non-tenants who farmed the land but lived elsewhere. Of this total, forty-three are registered voters. There are thirty-three of that forty-three who are registered voters and are still engaged as sharecroppers on the properties of Daniel and Truitt while ten were asked to leave by the end of the crop year, January 1, 1966. It will be remembered that Mr. Daniel testified that during the year 1965 his operation showed a loss of some $42,000, and that, in view of these heavy losses, changes had to be made in his operation. The record further shows that for the year 1965, the five tenant sharecroppers who were asked to leave accounted for a total production of only $11,034.31, while the four who were allowed to remain, and who, incidentally, are registered voters, accounted for a total production of $27,302.80. During the years 1961–1965, the five who were asked to leave produced a total of only $38,953.87, while the four who remained produced a total of $89,086.18, despite the fact that one of these four had been farming on the property only during the years 1964 and 1965. During the year 1965, Daniel and Truitt employed a total of one hundred seventy-seven day laborers, forty-five of whom were registered voters. In its overall operation in 1965, Daniel and Truitt had seventy-eight Negroes who were registered to vote working on their property. This includes tenant sharecroppers, non-tenant sharecroppers, cash renters, and day laborers. Of this number, ten were asked to vacate the premises at the end of the crop year on January 1, 1966. The unrefuted testimony of Mr. Daniel was to the effect that these ten were the least productive on his place, and the records filed in evidence corroborate this testimony. There is certainly substantial evidence to establish an economic justification for the eviction notices having been given to these particular tenants, and there is certainly a dearth of evidence to support the plaintiff's allegations that these evictions were designed to intimidate, threaten, or coerce the defendants' tenants because of their voting activities.

The word "intimidate" is defined by Webster as "to frighten; to make timid or fearful; to inspire or affect with fear; to deter, as by threats." The word "threat" is defined as "the expression of an intention to inflict evil or injury on another; menace; threatening; denunciation." To "threaten" is "to utter threats against; promise punishment, reprisal, or the like." And to "coerce" is "to restrain by force; to repress; to

curb; or to compel to any action." The Court, in Pray v. Pray, 128 La. 1037, 55 So. 666 (1911) said:

"Intimidation, as relates to law, has a definite meaning. It consists in putting a person in fear in some way."

Without the necessity of further discussion, suffice it to say that the evidence in this case is completely and totally void of any proof of intimidation, threats, or coercion used by these defendants for the purpose of interfering with any rights granted by the Voting Rights Act of 1965. Thus, even assuming, but by no means holding, that the Act in question is a valid exercise of the power of Congress as conferred by the Fifteenth Amendment, the record in this case compels a holding that even on the merits, the plaintiff has completely and totally failed in its endeavor to prove, by a preponderance of the evidence, that these defendants acted in violation of Section 11(b) of the Voting Rights Act of 1965. Thus, for all of these reasons, the plaintiff's demands must be rejected, and the temporary restraining order previously issued herein will be recalled, vacated, and set aside.