379 F.2d 33
 Joseph Lee JONES and Barbara Jo Jones, Appellants,
v.
ALFRED H. MAYER COMPANY, a Corporation, Alfred Realty Company, a Corporation, Paddock Country Club, Inc., a Corporation, Alfred H. Mayer, an Individual and an Officer of the Above Corporations, Appellees.
 No. 18473.
 United States Court of Appeals Eighth Circuit.
 June 26, 1967.
 
 Samuel H. Liberman, II, St. Louis, Mo., for appellants; Arthur A. Leff, St. Louis, Mo., on the brief.
 Israel Treiman of Shifrin, Treiman, Schermer & Susman, St. Louis, Mo., for appellees.
 Sol Rabkin and Joseph B. Robison, New York City, filed brief amicus curiae for National Committee Against Discrimination in Housing.
 Before BLACKMUN, MEHAFFY and LAY, Circuit Judges.
 BLACKMUN, Circuit Judge.
 
 
 1
 This case comes close to raising nakedly the question whether, in the absence of federal and state open housing legislation, an owner of a home, which is on the market for sale, may refuse to sell that home to a willing purchaser merely because that purchaser is a Negro. The district court has phrased the sensitive issue, in the case's factual context, as follows:
 
 
 2
 "[T]he issue is whether the willful refusal of an owner of private property who is developing a private subdivision thereon to sell a part of his property to a Negro solely because of race entitles the person so discriminated against, under any presently applicable federal law, either to damages or to a mandatory injunction or both."
 
 
 3
 The case is here by way of an appeal by the plaintiffs from the dismissal of their complaint for failure to state a cause of action. Judge Regan's comprehensive memorandum is reported as Jones v. Alfred H. Mayer Co., 255 F. Supp. 115 (E.D.Mo.1966). We are favored with helpful briefs by the parties and by the National Committee Against Discrimination in Housing which, as amicus curiae, urges reversal particularly in the light of the Civil Rights Act of 1866 and its present codification as 42 U.S.C. § 1982. Jurisdiction is established under 28 U.S.C. § 1343(3) and (4).
 
 
 4
 A. The Facts. Because the motion to dismiss was granted, the facts, so far as this appeal is concerned, are those well pleaded in the complaint. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Jenson v. Olson, 353 F.2d 825, 828 (8 Cir. 1965); Bonnot v. Congress of Independent Unions, 331 F.2d 355 (8 Cir. 1964); McCleneghan v. Union Stock Yards Co., 298 F.2d 659, 662-663 (8 Cir. 1962).
 
 
 5
 The plaintiffs, Joseph Lee Jones and Barbara Jo Jones, are husband and wife. Joseph Lee Jones is a Negro. Both are federal employees and Missouri citizens. The defendants, four in number, are Alfred H. Mayer Company, a corporation engaged in the business of developing subdivisions in Saint Louis County, Missouri, and of constructing homes to be sold to the public; Alfred Realty Co., a Missouri licensed[1] corporate real estate broker acting as the exclusive sales agent for Mayer houses; Alfred H. Mayer who owns the controlling interest in both corporations, who is their managing officer, and who also is licensed by Missouri as a real estate salesman; and Paddock Country Club, Inc., a corporation controlled by the other defendants "for the primary use and benefit of the people in" Paddock Woods, a subdivision which the defendants are presently developing.
 
 
 6
 In June 1965 plaintiffs were looking for a new home and, in consequence of an advertisement in the St. Louis Post-Dispatch, went to Paddock Woods, picked up a brochure describing the development there, and inspected display homes on the site. They determined that a certain style of house suited their needs and resources and was reasonably accessible to their places of employment. According to the defendants' promotional material this house could be built and sold for $28,195. The plaintiffs selected a lot as their first choice among those available in the subdivision. The defendants, through their agents, "refused to consider Plaintiffs' application to purchase a house and to enter into a contract for the sale of a house and lot, because Joseph Lee Jones is a Negro, and it is Defendants' general policy not to sell said houses and lots to Negroes".
 
 
 7
 The complaint also recites: Paddock Woods includes more than 100 projected homes, with more plats to be opened. The ultimate result will be a suburban community of about a thousand people "living in an area chosen by Defendants for development, residing in homes designed and built by Defendants, driving on streets built by Defendants, playing golf on the nearby eighteen (18) hole course built by Defendants for the convenience of residents of [this and other nearby subdivisions developed by Defendants], and enjoying the facilities of the nearby bath and tennis club which Defendants plan to open * * * for the exclusive use of residents of Paddock Woods".
 
 
 8
 The complaint further alleges state and municipal involvement by the Missouri incorporation of the three corporate defendants; the protection afforded the defendants "by various state laws and local ordinances, in particular zoning codes, building codes, banking and lending laws, and numerous laws effecting the transfer and development of real property"; the approval of plans by the county building commissioner; the furnishing of sewer service by the metropolitan district; the responsibility of the planning commission for zoning; the county recording of transfers and restrictions; the availability of the traffic and highway departments and the county engineer; the education of children in a tax supported school district; and the furnishing of electric and gas services by state licensed utilities. It is also alleged that Paddock Woods is "enlarged" by the defendants' other nearby developments "all of which are financed by loans insured by the Federal Housing Administration".
 
 
 9
 There is no allegation of federal or state monetary assistance in the development of the Paddock Woods subdivision. The amicus brief states flatly that "it is conceded for this appeal that defendants have not accepted any form of direct state or federal aid or financing which might have subjected them to federal statutes or executive orders or constitutional provisions which bar recipients from engaging in discrimination based on race in using the benefits of such aid in their project".
 
 
 10
 The prayer asks for $50 ordinary damages, $10,000 punitive damages, and injunctive relief.
 
 
 11
 It is against these facts that the defendants' motion to dismiss was filed.
 
 
 12
 B. The Grounds Asserted. The complaint alleges violation of rights under the Civil Rights Acts of 1866, 1870 and 1871, from which 42 U.S.C. §§ 1982, 1981, and 1983, are respectively derived; under §§ 201 to 207 of the Civil Rights Act of 1964, 42 U.S.C. § 2000a to 2000a-6, relating to public accommodations; under Executive Order No. 11063, entitled "Equal Opportunity in Housing", 27 F.R. 11527 (1962); under the Thirteenth and Fourteenth Amendments; and under the enabling clause of Article I, § 8, and the supremacy clause of Article VI of the Constitution. The 1964 Act and the Executive Order, however, are not urged on the appeal.[2]
 
 
 13
 The plaintiffs argue (1) that the complaint states facts which constitute a violation of rights, guaranteed to them by § 1982, to purchase property without discrimination; (2) that § 1982 is valid and applicable whether or not "state action" is involved; and (3) that, in any event, the discrimination suffered by the plaintiffs results from state action. The amicus argues similarly, stresses that § 1982 is applicable here without regard to the presence of any indicia of state action, and relies particularly on the legislative history. It urges that there is an "imperative need for speedy federal action to help break down the walls of housing prejudice"; that the use of federal and state power "cannot wait for a reluctant Congress"; that "Builders of white suburban communities must not be allowed to spread the plague of housing segregation"; and that "since 1866 there has been federal legislation which bars racial discrimination in the sale or lease of real property". The amicus views the issue of the applicability here of § 1982 as "a novel issue, never before presented to the federal courts".[3]
 
 
 14
 The appeal, thus, pivots primarily on § 1982.
 
 
 15
 The defendants, in response, claim that the plaintiffs, in order to make a case under the section, must show that state action is present and that the facts alleged do not constitute conduct involving state action.
 
 C. The Statutes. These read:
 
 16
 "§ 1982. Property rights of citizens
 
 
 17
 "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.
 
 
 18
 "§ 1981. Equal rights under the law
 
 
 19
 "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 
 
 20
 "§ 1983. Civil action for deprivation of rights
 
 
 21
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."
 
 
 22
 D. The Chronology. The history of § 1982, of the companion §§ 1981 and 1983, and of the Thirteenth and Fourteenth Amendments, is not without interest and significance and we examine it.
 
 
 23
 1. The Thirteenth Amendment ("Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction", plus an enabling section) was certified by the Secretary of State on December 18, 1865. 13 Stat. 774.
 
 
 24
 2. The first of the civil rights statutes was the Act of April 9, 1866, ch. 31, 14 Stat. 27.[4] It is evident from its language that this statute is the precursor of both the present § 1982 and § 1981. It has been recognized that the Act, which was passed over the first President Johnson's veto within four months after the Thirteenth Amendment became effective, came about "by virtue of this amendment". United States v. Harris, 106 U.S. 629, 640, 1 S.Ct. 601, 27 L.Ed. 290 (1882); Civil Rights Cases, 109 U.S. 3, 22, 3 S.Ct. 18, 27 L.Ed. 835 (1883); United States v. Morris, 125 F. 322, 323 (E.D.Ark.1903).
 
 
 25
 3. The Fourteenth Amendment (citizenship; privileges and immunities; due process; equal protection; other provisions; and an enabling section) passed the United States Senate on June 8, 1866, and the House on June 13 of that year, and thus was proposed on the latter date. Cong.Globe, 39th Cong., 1 Sess., 3042, 3148-49. It was certified finally by the Secretary of State on July 28, 1868.
 
 
 26
 It is at once apparent that the 1866 statute was enacted prior to the formal proposal of the Fourteenth Amendment. This fact has been judicially noted. United States v. Price, 383 U.S. 787, 804, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); Hurd v. Hodge, 334 U.S. 24, 32, 68 S.Ct. 847, 92 L.Ed. 1187 (1948); Oyama v. State of California, 332 U.S. 633, 640, 68 S.Ct. 269, 92 L.Ed. 249 (1948); Civil Rights Cases, supra, p. 22 of 109 U.S., p. 29 of 3 S.Ct.; County of San Mateo v. Southern Pac. R. R., 13 F. 145, 149 (C.C.D.Cal.1882, Mr. Justice Field); Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 83, 91, 21 L.Ed. 394 (1872), Mr. Justice Field dissenting.
 
 
 27
 4. The second civil rights statute was the Enforcement Act of May 31, 1870, ch. 114. Section 16 of that Act, 16 Stat. 144, did not include the words "to inherit, purchase, lease, sell, hold, and convey real and personal property", which were in the 1866 statute, but otherwise did contain, with minor exceptions immaterial here, the earlier Act's language now found in § 1981. The Supreme Court has characterized § 16 as "patterned after § 1 of the Civil Rights Act of 1866". Hurd v. Hodge, supra, p. 31 of 334 U.S., p. 851 of 68 S.Ct., footnote 7. Moreover, § 18 of the 1870 Act provided flatly that the 1866 Act "is hereby re-enacted". The resulting codification effect, therefore, appears to have been the separation of the property right guaranties for non-white citizens from the more generally stated equality provisions.
 
 
 28
 It has been noted that there were doubts in some quarters as to the constitutional validity of the 1866 Act; that the first section of the Fourteenth Amendment had as one of its purposes the elimination of such doubts; and that those doubts were removed by the amendment. Hurd v. Hodge, supra, pp. 32-33 of 334 U.S., pp. 851-852 of 68 S.Ct. and Mr. Justice Field dissenting in the Slaughter-House Cases, supra, pp. 93 and 97 of 83 U.S. (16 Wall.), and in Ex parte Virginia, 100 U.S. 339, 349, 364-365, 25 L.Ed. 676 (1879), and partially concurring in Virginia v. Rives, 100 U.S. 313, 324, 333, 25 L.Ed. 667 (1879).
 
 
 29
 5. Section 1 of the Enforcement or Anti-Lynching or Ku Klux Klan Act of April 20, 1871, ch. 22, 17 Stat. 13, was a forerunder of what is now § 1983. It provided liability and redress for certain deprivations of civil rights. It referred specifically to the 1866 Act. Its title was "An Act to enforce the Provisions of the Fourteenth Amendment * * *." The Supreme Court has described the Act as "one of the means whereby Congress exercised the power vested in it by § 5 of the Fourteenth Amendment to enforce the provisions of that Amendment". Monroe v. Pape, 365 U.S. 167, 171, 81 S.Ct. 473, 475, 5 L.Ed. 2d 492 (1961).
 
 
 30
 6. The next pertinent and, until 1957, the last civil rights act was that of March 1, 1875, ch. 114, 18 Stat. 335. Its first two sections were declared unconstitutional in the Civil Rights Cases, supra. 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883).
 
 
 31
 From this chronology one sees, in summary, that the 1866 Act followed immediately upon the Thirteenth Amendment; that it became law before the Fourteenth Amendment was proposed by Congress; that the Fourteenth Amendment was directed to situations not reached by the Thirteenth or by the 1866 Act, or, at least, only questionably covered by them; that, seemingly, the 1870 and 1871 Acts were an implementation of the Fourteenth Amendment; and that the 1866 statute was reenacted as part of the 1870 Act.
 
 
 32
 E. The Fourteenth Amendment's § 1 and state action. There is no question that § 1 and its guaranties of privileges and immunities and equal protection are directed at and prohibitive of "state action". The language, "No State shall" and "nor shall any State deprive", is indicative and clear. It would seem to follow that enabling legislation, to the extent it is enacted in enforcement of the Amendment's first section is so to be directed and is so limited. It was on an approach of this kind that the first two sections of the 1875 Act, relating to equal enjoyment of places of public accommodation were held unconstitutional in 1883:
 
 
 33
 "The first section of the Fourteenth Amendment * * * is prohibitory in its character, and prohibitory upon the states. * * * It is state action of a particular character that is prohibited. Individual invasion of individual rights is not the subject-matter of the amendment. * * * [U]ntil some State law has been passed, or some State action through its officers or agents has been taken * * * no legislation of the United States under said amendment, nor any proceeding under such legislation, can be called into activity. * * * The wrongful act of an individual, unsupported by any [State] authority, is simply a private wrong, or a crime of that individual". Civil Rights Cases, supra, pp. 10, 11, 13 and 17 of 109 U.S., p. 21 of 3 S.Ct.
 
 
 34
 Significant state action has been the consistent measuring stick under § 1 of the Fourteenth Amendment. Virginia v. Rives, supra, p. 333 of 100 U.S.; United States v. Harris, supra, pp. 638-639 of 106 U.S., 1 S.Ct. 601; Corrigan v. Buckley, 271 U.S. 323, 330, 46 S.Ct. 521, 70 L.Ed. 969 (1926); Shelley v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); Hurd v. Hodge, supra, p. 31 of 334 U.S., 68 S.Ct. 847; Burton v. Wilmington Parking Authority, 365 U.S. 715, 721-722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); United States v. Guest, 383 U.S. 745, 754-756, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); United States v. Price, supra, p. 799 of 383 U.S., 86 S.Ct. 1152; Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).
 
 
 35
 F. State action and § 1982. Despite the facts of chronological priority of the Act of 1866 over the Fourteenth Amendment and the derivation of § 1982 from the 1866 Act, is this section nevertheless infected today with any limitation of scope and application attendant upon the Amendment's first section and federal legislation which enforces it?
 
 
 36
 There are definite indications in Supreme Court opinions that the 1866 Act and § 1982 are subject to the limitations of the Amendment's first section and are not now to be regarded as direct legislation implementing, instead, the Thirteenth Amendment. In Virginia v. Rives, supra, p. 333 of 100 U.S., Mr. Justice Field said, "After [the Fourteenth Amendment's] adoption the Civil Rights Act was re-enacted, and upon the first section of that amendment it rests". In Ex parte Virginia, supra, p. 345 of 100 U.S., the Court said, "They [the Thirteenth and Fourteenth Amendments] were intended to be, what they really are, limitations of the power of the States". The Court in the Civil Rights Cases, supra, p. 16 of 109 U.S., 3 S.Ct. 18, discussed the 1866 Act and its enactment. It referred to the penal portion of the statute and its reference to state law. Although noting, p. 20, 3 S.Ct. p. 28, that the Thirteenth Amendment was self-executing and authorized enforcement legislation "primary and direct in its character", it observed that the Amendment was concerned with slavery. The Court said, pp. 22-24, 3 S.Ct. p. 30, that in 1866,
 
 
 37
 "[C]ongress did not assume, under the authority given by the thirteenth amendment, to adjust what may be called the social rights of men and races in the community; but only to declare and vindicate those fundamental rights which appertain to the essence of citizenship * * *. [T]he province and scope of the thirteenth and fourteenth amendments are different; the former simply abolished slavery: the latter prohibited the states from abridging the privileges or immunities of citizens of the United States * * *. The amendments are different, and the powers of Congress under them are different. * * * The thirteenth amendment has respect, not to distinctions of race, or class, or color, but to slavery. The fourteenth amendment extends its protection to races and classes".
 
 
 38
 The public accommodations legislation then under challenge was held authorized by neither the Thirteenth nor the Fourteenth Amendments. The first Mr. Justice Harlan alone dissented. See Buchanan v. Warley, 245 U.S. 60, 78-79, 38 S.Ct. 16, 62 L.Ed. 149 (1917).
 
 
 39
 In Corrigan v. Buckley, supra, it was said, pp. 330-331 of 271 U.S., p. 523 of 46 S.Ct.,
 
 
 40
 "The Thirteenth Amendment denouncing slavery and involuntary servitude * * * does not in other matters protect the individual rights of persons of the negro race. * * * [T]hey [§§ 1981, 1982, and 1983], like the Constitutional Amendment under whose sanction they were enacted, do not in any manner prohibit or invalidate contracts entered into by private individuals in respect to the control and disposition of their own property."
 
 
 41
 Of particular significance is Hurd v. Hodge, supra, a case concerning restrictive clauses in private conveyances. Mr. Chief Justice Vinson, in speaking for five of the six Justices who passed on the case, directly related the 1866 Act to the Fourteenth Amendment and spoke of the "close relationship" between the two, "for that statute and the Amendment were closely related both in inception and in the objectives which Congress sought to achieve". Both the statute and the joint resolution "were passed in the first session of the Thirty-Ninth Congress. * * * It is clear that in many significant respects the statute and the Amendment were expressions of the same general congressional policy". Pp. 33 and 32 of 334 U.S., p. 851 of 68 S.Ct. This is rather positive language.
 
 
 42
 There are seemingly contrary implications in United States v. Morris, supra, 125 F. 322 (E.D. Ark. 1903), where Judge Trieber made the historical distinction between the Thirteenth Amendment, on the one hand, and the Fourteenth and Fifteenth on the other, and observed, p. 324, "Congress is, therefore, authorized by the provisions of the thirteenth amendment to legislate against acts of individuals, as well as of the states, in all matters necessary for the protection of the rights granted by that amendment". Of like import, perhaps, are the comments of Judge Edgerton, in dissent, in Hurd v. Hodge, 82 U.S.App. D.C. 180, 162 F.2d 233, 235, 240-241 (1947).
 
 
 43
 G. The expansion of the state action concept. Although to this date the state action limitation has continued thus to be engrafted upon enabling legislation under the first section of the Fourteenth Amendment, and although we have these indications from the Supreme Court that the limitation applies to the 1866 Act and, consequently, to § 1982, we think we may safely observe, without belaboring the cases, that the Supreme Court and other courts in general have broadly viewed the concept of state action. Indeed, by this breadth of view they have ruled against and struck down discriminatory housing practices in a number of instances.
 
 
 44
 Shelley v. Kraemer, supra, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), is a leading example. There the Court held that state court enforcement of a private race discrimination agreement amounted to state action. The case involved an attempt to enforce such a restrictive covenant and thereby to void a sale by a willing white seller to a willing negro purchaser. Thus, the right to acquire property, which was "among the civil rights intended to be protected from discriminatory state action by the Fourteenth Amendment", was interfered with, even though "the restrictive agreements, standing alone, cannot be regarded as violative" of Fourteenth Amendment rights. The companion case of Hurd v. Hodge, supra, 334 U.S. 24, 68 S.Ct. 847 (1948), concerned a similar restrictive covenant in the District of Columbia. The Court found it unnecessary to resolve the Fifth Amendment issue advanced but held that § 1982 prohibited judicial enforcement of the restrictive covenant. An alternative ground for the decision was national public policy which does not permit the federal court to do in the District what a state court may not do under the Fourteenth Amendment and the holding in Shelley v. Kraemer. Later Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), complemented Shelley by denying damages for breach of a racially restrictive covenant.
 
 
 45
 State action has also been found in any significant participation or involvement in property. Burton v. Wilmington Parking Authority, supra, 365 U.S. 715, 81 S.Ct. 856 (1961) (privately owned restaurant in a building owned and operated by a state agency for public purposes); Derrington v. Plummer, 240 F.2d 922 (5 Cir. 1956), cert. denied 353 U.S. 924, 77 S.Ct. 680, 1 L.Ed.2d 719 (cafeteria in a county courthouse); Buchanan v. Warley, supra, 245 U.S. 60, 38 S.Ct. 16 (1917) (racial zoning laws); Com. of Pennsylvania v. Board of Directors, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (board, appointed under a statute, of a school funded by a will); Evans v. Newton, 382 U. S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (city supervision of a park); Banks v. Housing Authority, 120 Cal.App. 2d 1, 260 P.2d 668 (1953) (public housing development); Smith v. Holiday Inns of America, Inc., 336 F.2d 630 (6 Cir. 1964) (motel on land purchased from housing authority in redevelopment project promoted with public funds); Ming v. Horgan, 3 Race Rel.L.Rep. 693 (Cal.Super. Ct. 1958) (FHA and VA insured subdivisions). See Robinson v. State of Florida, 378 U.S. 153, 84 S.Ct. 1693, 12 L.Ed.2d 771 (1964); Anderson v. Martin, 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed. 2d 430 (1964); Lombard v. State of Louisiana, 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963); Peterson v. City of Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963); McCabe v. Atchison, T. & S. F. Ry., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169 (1914); Boman v. Birmingham Transit Co., 280 F.2d 531 (5 Cir. 1960); 3 A.L.R.2d 466; 14 A.L.R.2d 153.
 
 
 46
 There are instances in this area where courts have refused to find state action and have denied the requested relief. Barnes v. City of Gadsden, 174 F.Supp. 64 (N.D.Ala.1958), aff'd 268 F.2d 593 (5 Cir. 1959), cert. denied 361 U.S. 915, 80 S.Ct. 261, 4 L.Ed.2d 186 (city housing authority carrying out a slum clearance program); Dorsey v. Stuyvesant Town Corp., 299 N.Y. 512, 87 N.E.2d 541 (1949), cert. denied 339 U.S. 981, 70 S.Ct. 1019, 94 L.Ed. 1385 (low cost housing corporation organized under state redevelopment law); Johnson v. Levitt & Sons, 131 F.Supp. 114 (E.D. Pa.1955) (subdivision developer with mortgages guaranteed by FHA and VA); Hackley v. Art Builders, Inc., 179 F.Supp. 851 (D.Md.1960) (housing project).
 
 
 47
 H. The possible incipient emergence from the shackles of the state action limitation. Over and beyond this generally broad and seemingly expanding approach to the concept of state action are certain indications in recent Supreme Court opinions that State action is shrinking as a factor of deterrent influence in the area of discrimination. The new attitude seems to focus on other provisions of the Constitution or generously on the enabling § 5 of the Fourteenth Amendment and congressional action thereunder, rather than on the narrow state-confined feature of the amendment's first section.
 
 
 48
 Perhaps the first intimation of this is in the companion cases of Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), and Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), where the Court, through the commerce clause, struck down discriminatory practices. The Court there upheld certain portions of the public accommodations title of the Civil Rights Act of 1964, 78 Stat. 241, 243. Section 201 of the Act, 42 U.S.C. § 2000a, prohibits discrimination in any place of public accommodation and defines as such a place each of a number of described enterprises "if its operations affect commerce, or if discrimination or segregation by it is supported by State action". As noted, the Court relied on the commerce clause and refrained from passing on the issue of state action. Mr. Justice Douglas, in concurrence, 379 U.S. p. 279, 85 S.Ct. p. 369, was reluctant to rest solely on the commerce clause. He preferred to rest on the Fourteenth Amendment's enabling § 5 and expressed the thought that discrimination enforced by officials of a state or political subdivision thereof is state action. Mr. Justice Goldberg, in concurrence, p. 291, 85 S.Ct. p. 375 also relied on the Fourteenth Amendment's § 5 as well as the commerce clause.
 
 
 49
 Mr. Justice Clark, in the primary opinion in Heart of Atlanta made specific reference, pp. 250-252, 85 S.Ct. pp. 354-355, to the Civil Rights Cases and stated that that decision was without precedential value because the public accommodations provisions of the 1875 Act were not limited to businesses impinging on interstate commerce; because a business which in 1875 was not within the ambit of the commerce power was not necessarily outside it today; and because the government in the Civil Rights Cases had not relied on the commerce power and there is language in the opinion which indicates the Court "did not fully consider whether the 1875 Act could be sustained as an exercise of the commerce power".
 
 
 50
 Of greater significance are the several opinions in United States v. Guest, supra, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). That case concerned an indictment for criminal conspiracy, in violation of 18 U.S.C. § 241 ("to injure * * * any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States"), to interfere with the free enjoyment by Negroes of state owned facilities and with their right to travel freely over interstate highways in Georgia. In its primary opinion the Court again acknowledged that the Fourteenth Amendment protected only against state action and not against wrongs by individuals, but said, p. 755, 86 S.Ct. p. 1176, "This is not to say, however, that the involvement of the State need be either exclusive or direct." It held, pp. 756-757, 86 S.Ct. pp. 1177-1178, that an allegation of causing Negroes' arrest by means of false reports that they had committed criminal acts was broad enough, as against a motion to dismiss, to cover a charge of connivance by state agents and, pp. 758-759, 86 S.Ct. pp. 1178-1179, that the right to travel interstate is a constitutional right, although not explicitly mentioned in the Constitution. This, of course, could be just another example of the broad approach to the state action concept.
 
 
 51
 However, Mr. Justice Clark, joined by Mr. Justice Black and Mr. Justice Fortas, separately concurred, p. 761, 86 S.Ct. p. 1180, noting that the court avoided the question whether Congress could punish private conspiracies which interfered with Fourteenth Amendment rights. But he observed that, despite the Court's rejection of "any such connotation * * * there now can be no doubt that the specific language of § 5 [of the Fourteenth Amendment] empowers the Congress to enact laws punishing all conspiracies — with or without state action — that interfere with Fourteenth Amendment rights".
 
 
 52
 Mr. Justice Brennan, joined by the Chief Justice and Mr. Justice Douglas, p. 774, 86 S.Ct. p. 1187, was specific. He felt that the statute reached a private conspiracy to interfere with equal utilization of state facilities, for this was interference with a right secured by the Constitution, within the statute's meaning, "without regard to whether state officers participated in the alleged conspiracy". P. 777, 86 S.Ct. p. 1188. The statute was an exercise of congressional power under the Fourteenth Amendment's enabling clause. It prohibits all conspiracies. A right is "secured" by the Constitution "if it finds its source in the Constitution". He acknowledged that "an aspect" of the Civil Rights Cases confined the power of Congress but, p. 783, 86 S.Ct. p. 1191 "I do not accept — and a majority of the Court today rejects — this interpretation of § 5". He concluded that a majority "expresses the view today that § 5 empowers Congress to enact laws punishing all conspiracies to interfere with the exercise of Fourteenth Amendment rights, whether or not state officers or others acting under the color of state law are implicated in the conspiracy". P. 782, 86 S.Ct. p. 1191. See, also, the companion case of United States v. Price, supra, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966), and Mr. Justice Goldberg, concurring, in Bell v. State of Maryland, 378 U.S. 226, 286, 302-303, 305-311, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964).
 
 
 53
 Hurd v. Hodge is not cited in Heart of Atlanta, McClung, Guest, or Price.
 
 
 54
 These recent opinions imply for us a change of course. Certainly the opinions in Guest indicate that the reasoning of the Civil Rights Cases is in the process of reevaluation, if not overruling, and that a court may not need to stretch to find state action if appropriate congressional legislation is present.
 
 
 55
 All this leads us at last to the basic issue in the present case. Does § 1982, which is already on the books and which is derived from the Civil Rights Act of 1866, reach discrimination in private subdivision housing?
 
 
 56
 Three approaches are possible: That of the Thirteenth Amendment; that of the Fourteenth Amendment; and that of relating the private subdivision to a governmental function.
 
 
 57
 A. The Thirteenth Amendment. It may be argued that the right to purchase real property, a right assured by § 1982, is violated when a seller refuses to do business with a willing negro purchaser. The Thirteenth Amendment theory here would have to be that such discrimination imposes a "badge of slavery". This is precisely the approach used by Judge Trieber in United States v. Morris, supra, 125 F. 322 (E.D.Ark.1903). He there concluded that under the Thirteenth Amendment Congress has the power to protect the enjoyment of fundamental rights, "if the deprivation of these privileges is solely on account of his race or color, as a denial of such privileges is an element of servitude within the meaning of that amendment". P. 330.
 
 
 58
 There are, however, difficulties today with this Thirteenth Amendment approach. United States v. Morris seems to be the only supporting authority (other than, perhaps, Judge Edgerton's dissent, hereinabove noted, pp. 240-241 of 162 F.2d). The facts are not too clear, but that case has overtones of the deprivation of a right to pursue a vocation (farming) and thus seems to involve more than a simple right to purchase a home from an unwilling seller. Further, the reasoning in Morris, despite its having been decided later and despite its citation of the Civil Rights Cases, is basically contrary to the Civil Rights Cases where it was stated, pp. 21-25 of 109 U.S., that the denial of access to public accommodations was not the imposition of a badge of slavery. Also, Hurd v. Hodge, supra, so long as it stands free and unmolested in the reports, gives us great difficulty. As we have noted, the Supreme Court there stressed the 1870 reenactment and imposed upon § 1982 a distinct and definite Fourteenth Amendment overlay with the state action limitation. While we feel that the implications of Hurd v. Hodge could be regarded as greatly offended and restricted by the sweep of the language in United States v. Guest, the Supreme Court did not itself express concern about Hurd v. Hodge and, indeed, did not even cite it. It is not for our court, as an inferior one, to give full expression to any personal inclination any of us might have and to take the lead in expanding constitutional precepts when we are faced with a limiting Supreme Court decision which, so far as we are told directly, remains good law.
 
 
 59
 B. The Fourteenth Amendment. Section 1982 was reenacted under the authority of the Fourteenth Amendment. Clearly, therefore, the right to purchase property may not be encroached by state action. It is perhaps arguable that under the Guest rationale this right may not be violated by purely private action.
 
 
 60
 But what is this right to purchase? It is usually taken for granted that an owner may turn down any inquiring purchaser; in this sense there is no difference between a right to purchase possessed by a Negro and that possessed by a white. However, when the owner puts his property on the market, perhaps there is a difference. If it is placed on the market for whites only, whites have a right denied to Negroes. A right to purchase will be of limited scope if it can be denied or destroyed by those who place property on the market. See Robison, The Possibility of a Frontal Attack on the State Action Concept, 41 Notre Dame Law. 455 (1966).
 
 
 61
 On the other hand, there is a significant historical fact in all this. Clearly, one of the purposes of the Thirteenth and Fourteenth Amendments and of the 1866 Act and of § 1982 was to give the Negro citizenship and the right to own property and thus to acquire and to dispose of it. These were abilities which he did not possess under slavery. They are more fundamental than an ability to purchase from a seller. No one here challenges the right of these plaintiffs to own or to acquire real property. That purpose of the Amendments has been entirely fulfilled. But the plaintiffs claim a right to purchase a particular piece of property when the owner places it on the market. Is this, too, something which the Fourteenth Amendment goes so far as to reach?
 
 
 62
 There is another and opposing factor which deserves comment. A Fourteenth Amendment argument may have greater force in the case of the large real estate developer. He is in the business of selling homes and occupies a position somewhat different than that of the individual home owner. And a collateral supporting thesis was presented by Mr. Justice Douglas in his concurrences in Garner v. State of Louisiana, 368 U.S. 157, 176, 185, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961), and in Reitman v. Mulkey, supra, where he asserted that when a business is licensed it is because the business is affected with a public interest; that the public, as a consequence, has rights in respect thereto; and that it would be unconstitutional for the state to license a public business for the use of one race only. Yet licensing and subdivision factors alone were not deemed to be "exertions of state power" even in Ming v. Horgan, supra.
 
 
 63
 Thus, the Fourteenth Amendment's approach presents us with difficulties.
 
 
 64
 C. Governmental function. The argument is that a housing development, even though privately financed and built, is in effect the equivalent of a municipality and, thus, the private developer is carrying on a governmental function requiring the application of non-discriminatory standards. It is said that the state plays an important part in the success of the private housing development. It does so by way of licensing and regulation of the real estate business; zoning laws and building codes; required approval of subdivision plans; schools; utilities; police and fire services; and the like. In the private development a board of trustees usually manages the community, holds title to the streets, levies assessments for community services, and provides recreational facilities. It is asserted, then, that it is a denial of equal protection for the state to allow private persons discriminatorily to carry out what are governmental functions. See Marsh v. State of Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), where the Court imposed First and Fourteenth Amendment freedom of religion and press guaranties upon a company-owned town, and the white primary cases. Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), where the Court imposed the Fifteenth Amendment guaranty upon private political parties performing state election functions. The relationship of ownership of real property to the sovereignty of the state may also be stressed.
 
 
 65
 The difficulties with any application of the governmental function argument are that, to a large extent, it relies on state inaction, rather than state action, see Mulkey v. Reitman, 64 Cal.2d 529, 50 Cal.Rptr. 881, 413 P.2d 825, 834 (1966), affirmed 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830; it relies upon state assistance which is non-discriminatory in itself; and it necessarily concerns the ever elusive judicial determination, as contrasted with a legislative one, of what is a governmental function.
 
 
 66
 It would not be too surprising if the Supreme Court one day were to hold that a court errs when it dismisses a complaint of this kind. It could do so by asserting that § 1982 was, because of its derivation from the Thirteenth Amendment, free of the shackles of state action despite what has been said in Hurd v. Hodge. It could do so by asserting that, even though § 1982, because of its reenactment, was subject to Fourteenth Amendment limitations, we nevertheless have, on the accepted facts here, enough to constitute state action in the light of the expanding concept of that term. And it could do so on the ground, suggested in Guest, that state action is no longer a factor of limitation and that Congress has acted through § 1982 to reach private discrimination in housing.
 
 
 67
 We feel, however, that each of these approaches, at the present time, falls short of justification by us as an inferior tribunal. The Thirteenth Amendment approach has been made hazy and obscure by the 1870 reenactment and by the pronouncements in Hurd v. Hodge. The Fourteenth Amendment approach still carries the condition of state action. And the governmental function approach finds little helpful majority precedent in a legion of decided cases. Those where relief has been granted involve factual elements of far greater depth and significance than are present here. On this complaint we do not even have the thin gloss of governmental agency mortgage service in Paddock Woods.
 
 
 68
 Relief for the plaintiffs lies, we think, in fair housing legislation which will be tempered by the policy and exemption considerations which enter into thoughtfully considered statutes. Recent cases indicate that, if properly drawn, such legislation would encounter little constitutional objection. United States v. Price, supra, p. 789 of 383 U.S., 86 S.Ct. 1152; Colorado Anti-Discrimination Comm. v. Case, 151 Colo. 235, 380 P.2d 34 (1962); Massachusetts Comm. Against Discrimination v. Colangelo, 344 Mass. 387, 182 N.E.2d 595 (1962). The power exists but its exercise is absent. The matter, thus, is one of policy, to be implemented in the customary manner by appropriate statutes directed to the need. If we are wrong in this conclusion, the Supreme Court will tell us so and in so doing surely will categorize and limit those of its prior decisions, cited herein, which we feel are restrictive upon us.
 
 
 69
 A concluding word is indicated about the Supreme Court's very recent five to four decision in Reitman v. Mulkey, supra, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), concerning California's Proposition 14, added by initiative to that State's Constitution. The majority there concluded that positive state action "embodied in the State's basic charter, immune from * * * regulation at any level of the state government", as the California Supreme Court had found, was present and, being discriminatory, was violative of the Fourteenth Amendment. Mr. Justice Douglas, in concurrence, went further and, while perhaps recognizing that the situation might be different in "a case as simple as the one where a man with a bicycle or a car or a stock certificate or even a log cabin asserts the right to sell it to whomsoever he pleases", felt that the Court was dealing "with a problem in the realm of zoning", that "urban housing is in the public domain", and that "Leaving the zoning function to groups who practice racial discrimination and are licensed by the States constitutes state action in the narrowest sense in which Shelley v. Kraemer, supra, can be construed". The four dissenters, although conceding that the adoption of Proposition 14 by initiative constituted "state action", concluded that it embraced no affirmative and purposeful governmental enforcement which fostered discrimination and that, as a consequence, there was no impermissible deprival of equal protection.
 
 
 70
 We therefore must assume that, because of licensing by Missouri of the defendants Alfred H. Mayer and Alfred Realty Co. as a real estate salesman and broker, Mr. Justice Douglas would conclude that our affirmance of the district court here is error. We feel, however, that the four dissenters, who were unimpressed with the fact of California licensing in Reitman v. Mulkey, would be unimpressed with the fact of Missouri licensing here and would not find impermissible state action in the legislative vacuum of the present case. And we believe that the four members of the Reitman majority, who did not join Mr. Justice Douglas in the grounds stated for his concurrence, also would not be inclined to find much substance, so far as the present issue is concerned, in Missouri's licensing of the Mayers. We therefore conclude that our decision to affirm the district court in the present case is in line with the implications flowing from both the majority and the dissenting opinions in Reitman v. Mulkey and, indeed, is compelled by those opinions. The views entertained by Mr. Justice Douglas, of course, would require the opposing result.
 
 
 71
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Presumably pursuant to V.A.M.S., ch. 339, and particularly §§ 339.020 and 339.030
 
 
 [2]
 The Public Accommodations Subchapter of the 1964 Act relates to "any place of public accommodation" as therein defined, that is, to hotels, restaurants, theatres, and the like. The Executive Order, Section 101, concerns functions of the executive branch of the federal government which "relate to the provision, rehabilitation, or operation of housing and related facilities". It seems obvious that neither has direct application here
 
 
 [3]
 See, however, Justice (now Judge) Edgerton in dissent in Hurd v. Hodge, 82 U.S. App.D.C. 180, 162 F.2d 233, 235, 240-241 (1947)
 
 
 [4]
 "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."